STATE, Respondent, v. JACKMAN, Appellant.

*No. State 88. Argued October 3, 1973.—Decided October 30, 1973.*
(Also reported in 211 N. W. 2d 480.)

701

For the appellant there was a brief by *Hon. W. L. Jackman* of Madison, pro se, attorney, and *Arnold J. Wightman* of Madison, of counsel, and oral argument by *Judge Jackman.*

For the respondent the cause was argued by *John E. Kofron,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

HALLOWS, C. J.   The first issue is whether the requirement of the registration and numbering of the boat and of the payment of a $3.25 fee is a valid exercise of the police power.

The statute, sec. 30.51 (1),[1] provides no person shall operate a motorboat or sailboat over 12 feet in length on the waters of this state unless it is covered by a valid certificate of number issued pursuant to the statute or is exempt from its numbering requirement. Sec. 30.52 (3) [2]

[2] "30.52 Certificates of number; applications; issuance; renewals; fees . . .

"(3) FEES. A fee of $3.25 shall be paid to the department for the issuance of a certificate of number or renewal thereof valid for the whole or any part of a numbering period, subject to the following exceptions:

"(a) For issuance of a certificate of number to the new owner upon transfer of ownership of a boat numbered in this state, the fee shall be $1.25 if the certificate is issued for the remainder of the numbering period for which the previous certificate was issued.

"(b) A person owning or otherwise holding 3 or more boats ready for hire generally or ready to let in connection with the operation of resort facilities or guide services may, at his option, pay a flat fee of $5 plus 75 cents per boat for obtaining or re-

requires the payment of $3.25 for the issuance of a certificate of a boat number. The Wisconsin statutes relating to the regulation of boating (secs. 30.50 to 30.80, inclusive) are traceable to the Federal Boating Act of 1958.[3] The federal act, sec. 527 (a) and (c), required the secretary of the department administering the Coast Guard to establish a numbering system for boats in the United States and to set standards for state numbering systems. The act in sec. 527 (c) required that boat numbers be secured from the state of principal use or from the federal numbering authority in the event the state of principal use had no approved numbering system. Sec. 527 (c) (10) of the federal act provided that states might charge fees in connection with the issuance of certificates of numbers. In 1958 the Wisconsin legislature enacted an act entitled "Regulation of Boating," ch. 505, sec. 5, Laws of 1959, which created secs. 30.50 to 30.80, inclusive, Stats. The provisions of this act requiring the numbering of boats have been approved as meeting the requirements of the Federal Boating Act of 1958.

Both the federal and the state acts are related to boat safety. The legislative history of the federal law indicates it was "to promote boating safety on navigable waters of the United States, its territories and the District of Columbia." *See* 3 United States Congressional and Administrative News (1958), p. 5228. In considering the

newing certificates of number for such boats in lieu of the fee which otherwise would be payable."

[3] Public Law 85-911, 46 USC, subchapter III, page 11405, sec. 527. The boating act of 1958 has been repealed but Congress has enacted the Federal Boat Safety Act of 1971 (Public Law 92-75, August 10, 1971), 46 USCA, secs. 1451, *et seq*. This law provides a state with an approved system of numbering is an issuing authority under the federal act. Since the conviction in this case occurred prior to the enactment of this law, it is not governing in this case.

regulatory program in Wisconsin, the Report of the Interim Boating Committee to the 1959 Wisconsin legislature stated at page v in its Synopsis of Conclusions and Recommendations that Wisconsin should take advantage of the Federal Boating Act, that the evidence did not warrant a statewide periodic boat inspection program to determine seaworthiness, but enforcement officers should be authorized to stop and check boats for compliance, that the state conservation department should be charged with the duty of conducting a comprehensive program of boating safety education, and that the boat numbering fees should be earmarked to finance the boat-numbering program, a program of state aids relative to local enforcement, and the boat safety and enforcement work of the conservation department. The interim boating committee had before it evidence that the registration and numbering of boats as a means of identifying them would aid in the recovery of stolen boats, in apprehending violators of the law, and in rescue operations by making possible a quick check with the owner of a capsized or drifting boat to see if anyone had been using it. *See* Report of the Interim Boating Committee, Findings and Recommendations, p. 11.

Jackman argues the registration and numbering system must be coupled with an inspection program so that the award of a number signifies the boat complies with safety standards. Lacking such an inspection, it is argued the numbering is purely for identification and bears no relationship to safety; we disagree. Identification without inspection bears sufficient relationship to safety in other respects to justify the exercise of the police power. Inspection prior to registration might be beneficial but it is not the only ground or a necessary ground to validate a registration system. Jackman relies on *Brooklyn Center v. Rippen* (1959), 255 Minn. 334, 96 N. W. 2d 585, 588, which stated municipal control of licensing is not necessary to an efficient regulation of

boating activities. This may be true, but the test is not whether the licensing is necessary to safety but whether registration of boats bears a reasonable relationship to safety. The test is whether the means chosen have a reasonable and rational relationship to the purpose or object of the enactment; if it has, and the object is a proper one, the exercise of the police power is valid. *State ex rel. McGrael v. Phelps* (1910), 144 Wis. 1, 128 N. W. 1041; *Bisenius v. Karns* (1969), 42 Wis. 2d 42, 165 N. W. 2d 377. Jackman does not question that public safety is a proper object of the police power; he does question, however, any valid relationship between registration and safety. We believe identifying a boat, like identifying an automobile or a motorcycle, bears a relationship to safety. Promoting safety is not limited to the prevention of accidents or the determination of a boat's seaworthiness but includes efforts to minimize the consequences of accidents; and since the system of numbering and registration of boats may aid in rescue operations, it bears in fact a reasonable relationship to safety.

We find no merit in the contention that the numbering system is invalid because it applies only to motorboats or sailboats in excess of 12 feet, with exceptions, while the safety regulations of the statutes apply to all boats. The Report of the Interim Boating Commission to the 1959 Wisconsin legislature explained that most of the safety problems which numbering is designed to solve are caused by motorboats rather than by rowboats and canoes. In exercising its police power, the state is not required to make the licensing of boats co-extensive with the safety regulations. A classification in police power means will be sustained if there is a reasonable and practical ground for the classification, even though some other classification might appear to be more in accord with general welfare. If the classification is reasonable and practical in relation to the objective, that is sufficient and

doubts must be resolved in favor of the reasonableness of the classification. *Mehlos v. City of Milwaukee* (1914), 156 Wis. 591, 604, 146 N. W. 882; 16 Am. Jur. 2d, *Constitutional Law,* p. 583, sec. 297.

One of the main concerns of Jackman is that the fee for numbering of boats is a tax, impost or duty within the meaning of art. IX, sec. 1 of the Wisconsin Constitution.[4] The staff report of the Wisconsin Legislative Council to the Judiciary Committee on Navigable Waters, SR–61–7 (1960), delineates the origin and history of this navigable-waters clause in our constitution. It is identical with art. IV of the Northwest Ordinance of 1787 and was contained in the federal enabling act of 1846 which enabled the Wisconsin territory to organize as a state. The provision in the Northwest Ordinance respecting the nature of navigable waters and their freedom from tax, impost or duty was one of the conditions under which Virginia ceded the Northwest Territory to the Confederation in 1784. *See Muench v. Public Service Comm.* (1952), 261 Wis. 492, 53 N. W. 2d 514, 55 N. W. 2d 40; Kanneberg, *Wisconsin Law of Waters,* 1946 Wis. L. Rev. 345, 349. In 1773, the problem of the freedom of navigation on the principal western waterways was a significant matter of public policy. Spain owned the mouth of the Mississippi River, which she closed to American shipping to end free American navigation on the Mississippi River. Waterways and connecting lands or "carrying places" between navigable waterways were important for the transportation between the Mississippi River and the Atlantic Ocean as an alternative route and a bypass to the Mississippi. The development of the mid-

[4] Art. IX, sec. 1, Wisconsin Constitution, provides in part "and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost or duty therefor."

west depended upon the freedom of navigating the inland rivers and waterways. When Congress had the sale of 1,500,000 acres of land along the Ohio and Muskingum Rivers to the Ohio Company of Associates under consideration to raise money to pay war debts, it was thought necessary to declare as public policy the freedom of the inland waterways and this declaration appeared in the final draft of the Northwest Ordinance of 1787.

The issue here is the meaning of the words "forever free . . . without any tax, impost or duty." In respect to tax, impost or duty, it is generally recognized that charges exacted in the exercise of the police power are not taxes and are not subject to constitutional limitations which apply to the exercise of the power to tax. 1 Cooley, *Taxation* (4th ed.), p. 94, sec. 26; 4 Cooley, pp. 3509–3516, secs. 1784–1786; *Morrill v. State* (1875), 38 Wis. 428, 20 A. R. 12. This court has made a distinction between taxes and fees. A tax is one whose primary purpose is to obtain revenue, while a license fee is one made primarily for regulation and whatever fee is provided is to cover the cost and the expense of supervision or regulation. *State ex rel. Attorney General v. Wisconsin Constructors* (1936), 222 Wis. 279, 268 N. W. 238; *Fitch v. Wisconsin Tax Comm.* (1930), 201 Wis. 383, 230 N. W. 37. The words "tax," "duty" and "impost," as used in the Wisconsin Constitution, are used in a narrow sense of direct charges on transportation for the use of the waterway. The navigable waters could not be converted from common highways into "toll roads" by the states. The history of the origin of the language used in the grant of the state of Virginia to the United States and included in the Northwest Territory supports this view. The commercial use of the internal waterways of Wisconsin was foremost in the minds of the territorial citizens and the delegates at the Constitutional Conventions of 1846 and 1848 and they included the navigable

water clause in our constitution. Wisconsin is the only state of five which were created out of the Northwest Territory which has done so. *See* Wisconsin Legislative Council Staff Report to the Judiciary Committee on the Navigable Waters Provision in the Wisconsin Constitution, p. 19.

We see no difference for the purpose of this case between a tax, impost, or duty. The registration fee is not an impost or duty in the common meaning of those terms; they are special types of taxes. Nor do we have any trouble with the words "forever free." "Free" has been held not to refer to physical obstructions but to political regulations which would hamper the freedom of commerce. *Willamette Iron Bridge Co. v. Hatch* (1888), 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629.[5] The prior decisions of this court are conflicting; some cases have construed art. IX, sec. 1, of the Wisconsin Constitution as prohibiting physical obstruction which interferes with the public right of navigation in navigable waters but not denying the right of the legislature to approve the erection of bridge, dam and other works which do not obstruct navigation. *Milwaukee Gas Light Co. v. The Schooner "Gamecock"* (1868), 23 Wis. 144 (pipelines); *Sweeney v. Chicago, Milwaukee & St. Paul Ry. Co.* (1884), 60 Wis. 60, 18 N. W. 756 (railroad

[5] In *Escanaba Co. v. Chicago* (1882), 107 U. S. 678, 2 Sup. Ct. 185, 27 L. Ed. 442, the court held that the navigable waters clause does not prohibit the construction on a navigable water of a dam, bridge, or other work so long as commercial intercourse on the water is not permanently obstructed. In *Cardwell v. American Bridge Co.* (1885), 113 U. S. 205, 212, 5 Sup. Ct. 423, 28 L. Ed. 959, the United States Supreme Court interpreted the navigable waters clause "as having but one object, namely, to insure a highway equally open to all without preference to any, and unobstructed by duties or tolls, and thus prevent the use of the navigable streams by private parties to the exclusion of the public, and the exaction of any toll for their navigation." A similar opinion was expressed by the court in *Huse v. Glover* (1886), 119 U. S. 543, 7 Sup. Ct. 313, 30 L. Ed. 487.

bridge); *In re Crawford County Levee and Drainage District* (1924), 182 Wis. 404, 196 N. W. 874 (drainage district) ; *Flambeau River Lumber Co. v. Railroad Comm.* (1931), 204 Wis. 524, 236 N. W. 671 (dam). Improvement of navigation through the construction of dams has been held not to violate the Northwest Ordinance. *See Wisconsin River Improvement Co. v. Manson* (1877), 43 Wis. 255. The validity of a regulating boom and the charge therefor even when the operation of the boom would temporarily obstruct the entire river and hinder navigation has been upheld. *J. S. Keator Lumber Co. v. St. Croix Boom Corp.* (1888), 72 Wis. 62, 38 N. W. 529. Of course, a political regulation which would hamper the freedom of commerce violates the constitution. *In re Southern Wisconsin Power Co.* (1909), 140 Wis. 245, 122 N. W. 801.[6] Likewise, a requirement to pay money for general revenue purposes for the use of a navigable waterway would constitute a tax and violate the constitution. This view is supported by an opinion of the attorney general, *see* 54 Op. Atty. Gen. (1965), 1.

---

[6] At the end of the 19th century and the early years of the 20th century, Wisconsin started to interpret art. IX, sec. 1, of the Wisconsin Constitution, as creating a public trust in navigable waters. *McLennan v. Prentice* (1893), 85 Wis. 427, 55 N. W. 764; *Priewe v. Wisconsin State Land & Improvement Co.* (1896), 93 Wis. 534, 67 N. W. 918; *Ne-pee-nauk Club v. Wilson* (1897), 96 Wis. 290, 71 N. W. 661; *Willow River Club v. Wade* (1898), 100 Wis. 86, 76 N. W. 273; *Illinois Steel Co. v. Bilot* (1901), 109 Wis. 418, 84 N. W. 855, 85 N. W. 402. In *Diana Shooting Club v. Husting* (1914), 156 Wis. 261, 269, 271, 145 N. W. 816, the court under the trust doctrine gave a broad construction to art. IX, sec. 1, holding that navigation included not only commerce but travel and recreation which included hunting and fishing. Although *Krenz v. Nichols* (1928), 197 Wis. 394, 222 N. W. 300, retreated from this broad construction, a return to the broad construction was made in *Muench v. Public Service Comm., supra.* Thus the change in the public use of navigable waters from commercial navigation to recreational activities found its way into the trust doctrine.

Jackman claims the $3.25 produces more revenue than is needed for supervision and regulation of the system of numbering of boats and therefore in fact raises revenue and is a tax. The county court took the view that even if there was a surplus of revenue, the amount of the fee was so small that it could not be considered a tax. The circuit court took the view that since the numbering of boats was related to safety, not only the revenue used for supervising the numbering system but also the revenue spent for other safety purposes must be considered. The evidence shows that for the period of 1959 to 1971 the total fees collected amounted to $3,195,527.61 and the total expenditures were $2,994,768.07, leaving a balance of $200,759.54. The total expenditures were broken down into three categories, the cost of boat registration of $770,414.50, the cost of boat safety enforcement which included salaries and expenses of DNR wardens who enforce boat safety regulations of $1,074,918.55, and the disbursements for safety patrol aids amounting to $1,149,435.02. The disbursements for safety patrol aids were paid to municipalities which maintain their own water-safety patrols. Under the view of the circuit court, there is a surplus of some $200,000 in a period of over ten years and this would not be indicative of a license fee raising revenue as its primary purpose. However, Jackman argues that only the $770,414.50, the cost of boat registration, can properly be considered, which leaves a surplus of approximately $2,400,000 for the period which is indicative of revenue and therefore the license fee is in fact a tax. We think this is too narrow a view of the legitimate purpose and use of the licensing fees. Since the registration of boats bears a reasonable relationship to safety, it is permissible to consider the cost of the related safety program.

Jackman argues the registration and numbering system is a license which creates a privilege to use the navigable waters of the state and thereby violates the freedom

aspect of art. IX, sec. 1 of the Wisconsin Constitution. While sec. 30.51 (1), Stats., provides that no one shall operate a motorboat or sailboat over 12 feet in length unless it is covered by a valid certificate number, this language is not to be read so narrowly as to mean the registration is a license to use the navigable waters of the state. Normally, a license is a right or permission granted by competent authority to do an act which without such license would be illegal. 53 C. J. S., *Licenses*, p. 445, sec. 1. The numbering of boats is not a true licensing system. Everyone who applies for a number and pays a fee is granted a number. The numbering system is not used to limit the number of persons who may participate in boating activities, nor do the applicants pass any test for boat-operating ability. The fee was not intended to grant permission to use the navigable waters. The words "charge for the use of navigable waters" was unfortunately used in *Madison v. Tolzmann* (1959), 7 Wis. 2d 570, 97 N. W. 2d 513, which case is relied on by Jackman. In that case, this court invalidated a city of Madison boat licensing ordinance which exacted a fee. The court stated the result of the licensing provision was "to exact a fee for the use of navigable waters, a matter of statewide concern." From this language, however, it does not follow that a fee for registering a boat by the state is necessarily for the use of the navigable waters or that all fees relating to boats using navigable waters are a charge for the use thereof. The licensing provision in the Madison ordinance was invalid because it dealt with a matter of statewide concern. The language that the "fee was for the use of navigable waters" is withdrawn. Nor does it follow that because the free use of navigable waters is a matter of statewide concern that a fee for registering a boat, although called a licensing fee, is necessarily for the use of navigable waters.

*By the Court.*—Order affirmed.

WILKIE, J., took no part.