Robert F. STEPHENS, Attorney General,
et al., Appellants,

v.

BONDING ASSOCIATION OF
KENTUCKY et al., Appellees.

Supreme Court of Kentucky.

June 11, 1976.

Rehearing Denied July 30, 1976.

C. Gibson Downing, Stoll, Keenon & Park, Harry B. Miller, Miller, Griffin & Marks, Lexington, for appellants.

Don H. Major, Mulhall, Major, Turner & Taylor, Louisville, for appellees.

JONES, Justice.

This proceeding originated as an action in Jefferson Circuit Court by Bonding Association of Kentucky, AA Bonding, and Spencer Bonding Co., Inc., against the Commonwealth Attorney of Jefferson County. The Attorney General of the Commonwealth was permitted to intervene. The members of the association and the respective bonding companies are commercial bail bondsmen. This suit was brought to test the constitutionality of certain provisions of House Bill No. 254. The trial court held that, "House Bill No. 254, as it related to prohibition or abolition of the bail bondsman business be and it is hereby declared unconstitutional as unreasonable and arbitrary in violation of the 14th Amendment of the U. S. Constitution and Sec. I of the Kentucky Constitution." The Commonwealth Attorney of Jefferson County, and the Attorney General of the Commonwealth, appeal from the final judgment entered in this action.

The issue on appeal centers upon Sec. I of House Bill No. 254. It is apparent to this court that the single question presented is whether Sec. I of House Bill No. 254 violates the 14th Amendment to the U. S. Constitution and Sec. I of the Kentucky Constitution.

The Kentucky General Assembly, at its 1976 session, enacted House Bill No. 254. The act is entitled, "An Act relating to the release of persons in criminal proceedings, and prohibiting certain practices in relation thereto." Sec. I of House Bill No. 254 provides:

"(1) It shall be unlawful for any person to engage in the business of bail bondsman as defined in KRS 304.-34–010(1), or to otherwise for compensation or other consideration:

(a) furnish bail or funds or property to serve as bail; or

(b) make bonds or enter into undertakings as surety; for the appearance of persons charged with any criminal offense or violation of law or ordinance punishable by fine, imprisonment or death, before any of the courts of this state, including city courts, or to secure the payment of fines imposed and of costs assessed by such courts upon a final disposition."

The penalty section of House Bill No. 254 provides that, "Any person who violates any provisions of this act not otherwise punishable by law or statute shall be guilty of a Class A misdemeanor for the first offense and guilty of a Class D felony for each additional offense."[1] House Bill No. 254, in its entirety, is a comprehensive bail reform act. It is unique in that it abolishes the professional, commercial bail bondsman as that practice existed before the enactment of House Bill No. 254.

The bonding companies argued in the trial court, as they do here, that the Commonwealth of Kentucky cannot, through legislation under its police power, abolish an entire business not inherently injurious to the public or demoralizing in its activities. They contend also that the business of commercial bail bondsmen can and should be regulated under existing statutory provisions. They argue that House Bill No. 254, as it relates to the abolition of the commercial bail bondsman is an unreasonable regulation without furtherance of any substantial public purpose.

---

1. A Class A misdemeanor carries a sentence of imprisonment for a term not to exceed 12 months. A Class D felony provides for a sentence of imprisonment for not less than one year nor more than five years.

The Commonwealth Attorney of Jefferson County and the Attorney General of the Commonwealth contend that the public interest in bail reform as provided in House Bill No. 254 outweighs the private pecuniary interest of commercial bail bondsmen. They argue that abolition of the compensated surety constitutes a reasonable exercise of the police power.

■ This court recognizes that it is within the province of the legislature to assimilate, consider and weigh all the factors inherent in the concept of public welfare. That which is detrimental to the Commonwealth is a proper basis for the legislature's consideration.[2]

Reform of the compensated surety in the bail bond system has been advocated in legal and judicial publications for many years. Authoritative studies and reports are critical of compensated surety in the criminal justice system. Many reports recommend the elimination of the compensated surety from the pretrial release system.[3]

"The professional bondsman is a feature of the criminal process almost unique to the United States. Only the United States and the Philippines apparently give him a major role in the criminal process. In U.S. courts his function is so important that it has often been said that it is he, not the court, who actually makes the effective bail decision . ..

"The professional bondsman is an anachronism in the criminal process. Critical analysis of his role indicates that he serves no major purpose that could not be better served by public offices at less cost in economic and human terms." American Bar Association Project on Minimum Standards for Criminal Justice, Pretrial Release pp. 61–64, 1968 approved draft.

In the foreword to Goldfarb's book *Ransom,* an excellent critique of the American bail system, former Associate Justice Goldberg of the Supreme Court of the United States writes:

"If it is true that 'the quality of a nation's civilization can be largely measured by the methods it uses in the enforcement of its criminal law,' then the American bail system as it now operates can no longer be tolerated. At best, it is a system of checkbook justice; at worst, a highly commercialized racket."[4]

■ The financial condition of the defendant should not be a determining factor in his relationship to the criminal process. The result of the checkbook system of pretrial justice is the creation of a lucrative private business. This effect has been summarized:

" . . . The effect of such a system is that the professional bondsmen hold the keys to the jail in their pockets. They determine for whom they will act as surety—who in their judgment is a good risk. The bad risks, in the bondsmen's judgment, and the ones who are unable to pay the bondsmen's fees, remain in jail. The court and the commissioner are relegated to the relatively unimportant chore of fixing the amount of bail."[5]

"The commercial bail bondsman has long been an anathema to the criminal defendant seeking to exercise his right to pretrial release. In theory, courts were to set such amounts and conditions of bonds as were necessary to secure the appearance of defendants at trial. . . Those who did not have the resources to post their own bond were at the mercy of

2. These considerations are contained in the preamble to the act and in the report of the joint meeting of the House and Senate Judiciary Committee on House Bill No. 254.

3. *National Advisory Commission on Criminal Justice Standards and Goals: Report on Courts,* Standard 4.6 p. 83, Standard 4.7 p. 85; *Report on Corrections,* Standard 4.4 p. 120 (January 23, 1973) *Ransom, a Critique of the American Bail System,* Ronald Goldfarb (1965);

Stainback, *Bail and Bail Bondsmen: Need for Reform in Kentucky,* 61 Ky.L.J. 601.

4. Goldberg, *Foreword* to R. Goldfarb, *Ransom* at ix (1965).

5. *Pannell v. United States,* 115 U.S.App.D.C. 379, 320 F.2d 698, 699 (1963) (Concurring opinion).

the bondsman who could exact exorbitant fees and unconscionable conditions for acting as surety." [6]

■ This court is of the opinion that the policy to be followed in promoting the public welfare is a legislative matter. If the interest of the public is affected, the adjustment is a matter for the legislature. That problem calls into play the "police power." That power is as broad and comprehensive as the demands of society make necessary. It must keep pace with the changing concepts of public welfare.[7] Certainly the legislature could take cognizance of the inherent evils and abuses of the compensated surety in the bail bond system.

■ The bonding companies concede that the business of compensated surety in the bail bond system is subject to reasonable regulation through the police power. They make an eloquent plea for the system to remain as it existed prior to enactment of House Bill No. 254. They assert that other provisions of House Bill No. 254, which deal with pretrial release, will bring about the demise of the compensated surety—that "they will die on the vine." [8]

■ This court now addresses the bonding companies' argument that this law results in the taking of property "without due process of law." [9] The exercise of police power almost inevitably involves the destruction or limitation of property rights without a hearing. There is no violation of the constitutional mandate if the police power is properly exercised. In a number of cases this court has upheld the exercise of police power in the public interest. Such holdings have resulted in stringent regulation or abolition of private businesses.

One hundred and ten years ago, this court recognized the legislature's power to prohibit attorneys from acting as surety for criminal defendants in Jefferson County and in the city of Louisville. Then, this court commented:

"Whilst it was evidently the intention of the framers of the constitution to secure prisoners the inestimable privilege of bail, it was not intended to declare the qualifications of the bail, *but to leave to the law making department the power, unabridged who should be deemed sufficient bail* . . .." [10] (Emphasis added)

One hundred years later, this court in reference to regulation and prohibition of businesses under the police power, said:

"It may be conceded that there have always been certain kinds of activity which, though not harmful or offensive per se, can be not only regulated under the police power but, because of their 'potential evil consequences,' prohibited altogether." [11]

■ The bail bonding business by compensated surety is not "an ancient honorable and necessary calling," but one whose evils have been tolerated because of deep-rooted antipathy against the confinement of persons entitled to a presumption of innocence pending trial. Bail bonding by compensated surety has never enjoyed a favorable status but exists because no better system has been provided. It does not have protection as an integral part of the judicial process that will require this court to invalidate a new system designed by the General Assembly to remedy the evils of the existing system and at the same time provide adequate guarantee of pretrial release.

The provisions of bail related to criminal defendants are governed by rules of this court. To argue that the compensated surety has the same standing as barbers,

6. *Schilb v. Kuebel,* 404 U.S. 357, 373–374, 92 S.Ct. 479, 488, 30 L.Ed.2d 502, Douglas, J. (dissent).

7. *Jasper v. Commonwealth,* Ky., 375 S.W.2d 709 (1964).

8. Bonding companies' oral argument.

9. U.S. Constitution, Section I, 14th Amendment.

10. *Johnson v. Commonwealth,* 63 Ky. (2 Duvall) 411 (1866).

11. *Bruner v. City of Danville,* Ky., 394 S.W.2d 939 (1965).

merchants, professions and other businesses is needless rhetoric.

On numerous occasions, this court has been presented with problems concerning regulation and prohibition of certain businesses. A city may forbid the operation of private sewage and garbage disposal facilities and compel its inhabitants to use public facilities.[12] Likewise, the state may prohibit the sale of alcoholic beverages in proximity to schools, hospitals, and places of worship.[13] Cities of certain classes can prohibit the operation of pool rooms.[14] The sale of "filled milk" has been prohibited though there was no evidence that the product was undesirable or unwholesome.[15]

The Kentucky General Assembly found the business of commercial bail bonding detrimental to the welfare of citizens of this Commonwealth. It responded accordingly by enacting House Bill No. 254. In so doing, the legislature severed the life-sustaining cord from the respirator that gave life to commercial surety bail bonding. Instead of letting commercial sureties "die on the vine," the enactment of House Bill No. 254 permits commercial bonding companies as surety for profit to go quickly and "gently into that good night."

 This court refrains from nullifying House Bill No. 254. Section I of the act with its companion sections has brought reform and needed relief to the state's bail system. It violates neither the 14th Amendment of the U.S. Constitution nor Section I of the Kentucky Constitution. This court holds that Section I of House Bill No. 254 is constitutional.

The judgment is reversed.

All concur.

12. *Cassidy v. City of Bowling Green*, Ky., 368 S.W.2d 318 (1973).

13. *Beacon Liquors v. Martin*, 279 Ky. 468, 131 S.W.2d 446 (1939).

14. *Arms v. Town of Vine Grove*, 203 Ky. 213, 262 S.W. 11 (1924).

15. *Carolene Products v. Hanrahan*, 291 Ky. 417, 164 S.W.2d 597 (1942).