COMMITTEE ON ASSEMBLY ORGANIZATION, Legislature
You ask whether a portion of Assembly Bill 894 is constitutional.
Assembly Bill 894 provides for a state waterfowl hunting stamp costing $3 which must be purchased and affixed to a hunting license before the licensee may hunt waterfowl during the designated waterfowl hunting season. Assembly Bill 894 proposes in part as follows:
"SECTION 2. 29.102 of the statutes is created to read:
 "29.102 WATERFOWL HUNTING STAMP. (1) Except as otherwise provided, no person may hunt waterfowl unless he or *Page 57 
she has a waterfowl hunting stamp affixed by the stamp's adhesive to the hunting license permitting the hunting of small game. The waterfowl hunting stamp shall be issued by the department and its agents and by county clerks. The fee for the waterfowl hunting stamp shall be $3. The waterfowl stamp shall be designed and produced by the department and shall expire annually on the same date each year that all hunting licenses expire. Any person who is exempt from payment or charge for a small game hunting license is also exempt from the fee under this subsection.
 "(2) (a) The department shall expend $2 of the $3 fee received from the sale of a waterfowl stamp for developing, managing, preserving, restoring and maintaining wetland habitat and for producing waterfowl and ecologically related species of wildlife.
 "(b) The department shall expend $1 of the $3 fee received from the sale of a waterfowl stamp for the development of waterfowl propagation areas within Canada which will provide waterfowl for this state and the Mississippi flyway. Money for the development of waterfowl propagation areas shall be provided only to nonprofit organizations. Before providing any money the department shall obtain evidence that the proposed waterfowl propagation project is acceptable to the appropriate provincial and federal governmental agencies of Canada."
The precise question presented is whether $1 of the $3 waterfowl hunting stamp can be spent for the development of waterfowl propagation areas in Canada by allowing one-third of the stamp fees collected to be given to non-profit organizations devoted to such Canadian development. Assembly Bill 894 makes mandatory the expenditure of one-third of the stamp fees collected for development of Canadian propagation areas.
What is the waterfowl hunting stamp, a tax or a license? It is my opinion that said stamp is a license or a part thereof, no different than the separate hunting licenses required for deer, bear or bowhunting under secs. 29.104-29.109, Stats. The nature of such licenses is not to tax but to regulate under the police power. Further, the license fee is imposed to pay for the regulation. In State ex rel. Atty. Gen. v. *Page 58 Wisconsin Constructors, 222 Wis. 279, 288-290, 268 N.W. 238
(1936), the court stated:
 ". . . The distinction between taxes and fees is quite clear. `Taxes,' it was said in Fitch v. Wisconsin Tax Comm. 201 Wis. 383, 230 N.W. 37, `are the enforced proportional contributions from persons and property, levied by the state by virtue of its sovereignty for the support of government and for all public needs. The state demands and receives them from the subjects of taxation within its jurisdiction that it may be enabled to carry into effect its mandates and perform its manifold functions, and the citizen pays from his property the portion demanded, in order that, by means thereof, he may be secured in the enjoyment of the benefits of organized society.' Taxes must rest on a state-wide constitutional purpose and must fall within the constitutional scope of the term `expenses of state,' as used in sec. 5, art. VIII, of the constitution. State ex rel. Owen v. Donald, 160 Wis. 21, 151 N.W. 331. Taxes are imposed for the purpose of general revenue. License and other fees are ordinarily imposed to cover the cost and expense of supervision or regulation. Milwaukee v. Milwaukee E. R. L. Co. 147 Wis. 458, 133 N.W. 593. See also Head Money Cases, 112 U.S. 580, 5 Sup.Ct. 247; United States v. Butler (AAA decision), 297 U.S. 1, 56 Sup.Ct. 312. The distinction between a tax and an imposition under the police powers is well stated in 4 Cooley, Taxation (4th ed.), p. 3511:
 "`The distinction between a demand of money under the police power and one made under the power to tax is not so much one of form as of substance. The proceedings may be the same in the two cases, though the purpose is essentially different. The one is made for regulation and the other for revenue. If the purpose is regulation the imposition ordinarily is an exercise of the police power, while if the purpose is revenue the imposition is an exercise of the taxing power and is a tax. If, therefore, the purpose is evident in any particular instance, there can be no difficulty in classifying the case and referring it to the proper power. . . .
 "(p. 3513) `Only those cases where regulation is the primary purpose can be specially referred to the police power. If revenue is the primary purpose and regulation is merely incidental the *Page 59 
imposition is a tax; while if regulation is the primary purpose the mere fact that incidentally a revenue is also obtained does not make the imposition a tax, although if the imposition clearly and materially exceeds the cost of regulation, inspection or police control, it is generally held to be a tax or an illegal exercise of the police power. . . .
 "(p. 3528) `The power of a state to require a license fee in the exercise of the police power is inherent, subject to the limitations upon the police power in general and to any constitutional limitations which may exist; but constitutional limitations on the power to tax have no application.' (Citing State v. Anderson, 144 Tenn. 564, 234 S.W. 768, 19 A.L.R. 180.)"
The court reaffirmed the Wisconsin Constructors case in Statev. Jackman, 60 Wis.2d 700, 707, 211 N.W.2d 480 (1973), where the boat license statute, sec. 30.51 (1), Stats., was challenged as contrary to Wis. Const. art. IX, sec. 1. The court stated (60 Wis.2d at p. 707):
 ". . . In respect to tax, impost or duty, it is generally recognized that charges exacted in the exercise of the police power are not taxes and are not subject to constitutional limitations which apply to the exercise of the power to tax. 1 Cooley, Taxation (4th ed.), p. 94, sec. 26; 4 Cooley, pp. 3509-3516, secs. 1784-1786; Morrill v. State (1875), 38 Wis. 428, 20 A.R. 12. This court has made a distinction between taxes and fees. A tax is one whose primary purpose is to obtain revenue, while a license fee is one made primarily for regulation and whatever fee is provided is to cover the cost and the expense of supervision or regulation. State ex rel. Attorney General v. Wisconsin Constructors (1936), 222 Wis. 279, 268 N.W. 238; Fitch v. Wisconsin Tax Comm. (1930), 201 Wis. 383, 230 N.W. 37. . . ."
In accord: State ex rel. Fairchild v. Wisconsin Auto. TradesAsso., 254 Wis. 398, 401, 37 N.W.2d 98 (1949). 61 Op. Att'y Gen. 180, 183-184 (1972).
In addition, it is my opinion that AB 894 does not pledge the credit of the state or create a debt contrary to the limitations imposed by Wis. Const. art. VIII, secs. 3 and 7. See WisconsinSolid Waste Recycling Auth. v. Earl, 70 Wis.2d 464,235 N.W.2d 648 (1975); *Page 60 State ex rel. Warren v. Nusbaum, 59 Wis.2d 391, 208 N.W.2d 780
(1973); State ex rel. Wisconsin Dev. Authority v. Dammann,228 Wis. 147, 277 N.W. 278, 280 N.W. 698 (1938).
A constitutional examination of AB 894 also requires evaluation under the public purpose doctrine. In State ex rel. Warren v.Nusbaum, supra, at pp. 413-415, the court discussed the public purpose doctrine:
 "While no specific clause in the constitution can be acclaimed as the genesis of the public purpose doctrine, it is a `well-established constitutional tenet.' Public funds may be expended for only public purposes. An expenditure of public funds for other than a public purpose would be abhorrent to the constitution of Wisconsin.
 "What constitutes public purpose is in the first instance a question for the legislature to determine and its opinion should be given great weight. Hammermill, supra; State ex rel. Warren v. Reuter (1969), 44 Wis.2d 201, 170 N.W.2d 790; State ex rel. Bowman v. Barczak, supra; David Jeffrey Co. v. Milwaukee (1954), 267 Wis. 559, 66 N.W.2d 362. If any public purpose can be conceived which might rationally be deemed to justify the act or serve as a basis for the instant expenditure, the test is satisfied and the court cannot further weigh the adequacy of the need or the wisdom of the method. State ex rel. Singer v. Boos (1969), 44 Wis.2d 374, 171 N.W.2d 307; State ex rel. Zillmer v. Kreutzberg (1902), 114 Wis. 530, 90 N.W. 1098. The court in West Allis v. Milwaukee County (1968), 39 Wis.2d 356, 377, 159 N.W.2d 36, stated:
 "`. . . Only if it is "clear and palpable" that there can be no benefit to the public is it possible for a court to conclude that no public purpose exists. . . .'
 "In Hammermill, supra, pages 48 and 49, this court stated:
 "`What constitutes a public purpose is in the first instance a question for the legislature to determine. This court in State ex rel. La Follette v. Reuter, supra. at pages 114 and 115, stated: *Page 61 
 ""`The rule for determining the public purpose for expenditure of public funds is set forth in State ex rel. Thomson v. Giessel (1953), 265 Wis. 207, 215, 216, 60 N.W.2d 763:
 "`"`The general rule as to the public purpose of the expenditure of public funds is stated in 81 C.J.S., States, p. 1149, sec. 133, as follows:
 "`""`Generally, in connection with the validity of the expenditure of state funds, what is . . . a public purpose, is a question for the legislature to decide with respect to which it is vested with a large discretion, which cannot be controlled by the courts unless its action is clearly evasive . . . . Where a doubt exists whether the purpose of an appropriation is public or private, it will be resolved in favor of the validity of the appropriation, . . ."'
 ""`The Thomson Case (1953), supra, at page 216, cited with approval, Carmichael v. Southern Coal Coke Co. (1937), 301 U.S. 495, 57 Sup.Ct. 868, 81 L.Ed. 1245, which states:
 ""`"`. . . The existence of local conditions which, because of their nature and extent, are of concern to the public as a whole, the modes of advancing the public interest by correcting them or avoiding their consequences, are peculiarly within the knowledge of the legislature, and to it, and not to the courts, is committed the duty and responsibility of making choice of the possible methods. [Citations.] As with expenditures for the general welfare of the United States [Citations], whether the present expenditure serves a public purpose is a practical question addressed to the lawmaking department, and it would require a plain case of departure from every public purpose which could reasonably be conceived to justify the intervention of a court. [Citations.] "'"'"
Waterfowl are migratory birds subject to regulation and control of the national government through treaties with Great Britain and Mexico, 16 U.S.C.A. sec. 715j. A Migratory Bird Conservation Commission, chaired by the Secretary of the Interior, administers16 U.S.C.A. sec. 715 et seq. enacted pursuant to treaty obligations. Each year the Secretary of the Interior issues general regulations and quotas for each state for the taking of waterfowl by hunting in its five *Page 62 
designated flyways, including the Mississippi flyway. See16 U.S.C.A. secs. 715i and 715n. Thereupon, the states determine their bag limits and quotas for the hunting season.16 U.S.C.A. sec. 715h. A federal hunting stamp is required to hunt any waterfowl. 16 U.S.C.A. sec. 718 et seq.
The federal government by direct appropriation acquires and maintains waterfowl refuges. 16 U.S.C.A. secs. 715k and 721. The states receive payments from the operation of national wildlife refuges. 16 U.S.C.A. sec. 715s. The states also receive payments from the sale of the federal hunting stamp. 16 U.S.C.A. sec. 718. In addition, Wisconsin participates in the wildlife restoration program set forth in 16 U.S.C.A. sec. 669 et seq. by enabling legislation contained in sec. 29.174 (13), Stats.
Scientific evidence has established the importance of water conditions in the prairie provinces of Canada and the North Central prairies of the United States to waterfowl population in the Mississippi flyway. In Waterfowl Tomorrow, U.S. Department of Interior, U.S. Government Printing Office 1964, LC #64-60084, the Secretary of the Interior reports at p. 39:
 "PRAIRIE POTHOLES are the backbone of duck production in North America. Filled with water, they constitute the most fruitful duck producing medium in the world. Given a few wet years, the prairie country can pyramid duck numbers to startling proportions. Several successive drought years bring an inevitable crash. Populations dwindle almost in direct proportion to the decline in water. For some species intimately tied to prairie habitat, it means dangerously low numbers and tightened hunting regulations.
 "The prairie pothole region makes up only 10 percent of the total waterfowl breeding area of this continent, yet it produces 50 percent of the duck crop in an average year — more than that in bumper years.
 "This region covers about 300 thousand square miles in south-central Canada and north-central United States. . . ."
The Mississippi flyway is the most important flyway of the five designated by the Department of Interior for administrative purposes. It also is the corridor used by most of the ducks bred in the *Page 63 
prairie regions of the United States and Canada. The Secretary of Interior reports further in Waterfowl Tomorrow at pp. 185-186:
 "MISSISSIPPI meant big river to the Ojibway Indians and `big' is the word we can use for the waterfowl flyway that bears its name. Besides having the grandaddy of all rivers, three of the five largest lakes of the world, and the number one inland waterway, this Flyway also has other `king-size' features suited to the needs of waterfowl and people.
 "The Mississippi Flyway States are Minnesota, Wisconsin, Michigan, Ohio, Indiana, Illinois, Iowa, Missouri, Kentucky, Tennessee, Arkansas, Louisiana, Mississippi, and Alabama. They embrace 742 thousand square miles, one-fourth the area of the 48 adjoining States.
 "These 14 States contain more than half the acreage of wetlands classified as having significant value to waterfowl in the 48 contiguous States. Their residents buy 40 percent of the duck stamps sold and kill nearly 40 percent of the total ducks taken in the United States.
 "The Mississippi Flyway draws from breeding grounds that reach northward to the Mackenzie River Delta and Alaska in the west and to Hudson Bay and Baffin Island in the east. It includes most of the productive prairie pothole region. . . .
 "We [Mississippi Flyway] boast 11.5 million acres of wetlands of high or moderate value and 20 million acres of lesser importance. Grainfields provide additional waterfowl range. This flyway in 1960 included the four leading soybean producing States, three of the four top rice producers, and one of the four top barley producers. Two-thirds of the Nation's corn crop is grown here. In short, the flyway is big in the things that count for the birds and for people who enjoy having them around. . . ."
The national value of migratory birds was declared by the U.S. Supreme Court in Missouri v. Holland, 252 U.S. 416, 435 (1920), which involved a challenge to the constitutionality of the Migratory Bird Conservation Act soon after its adoption pursuant to the treaty with Great Britain. The Court stated at p. 435: *Page 64 
 "Here a national interest of very nearly the first magnitude is involved. It can be protected only by national action in concert with that of another power. The subject-matter is only transitorily within the State and has no permanent habitat therein. But for the treaty and the statute there soon might be no birds for any powers to deal with. We see nothing in the Constitution that compels the Government to sit by while a food supply is cut off and the protectors of our forests and our crops are destroyed. . . ."
Certainly this national policy declaration applies validly to a well-established state policy to preserve and protect migratory birds and waterfowl in Wisconsin. It is entirely consistent also with the state's waterfowl conservation programs, its cooperative programs with the federal government and with scientific fact. It is my opinion that AB 894 as drafted violates no constitutional provision, policy or doctrine.
BCL:JPA