Gerald A. KAHN, Robert I. Hodgson, and Meiroff-Kahn
Bonding & Insurance, Inc., a Wisconsin corporation,
Plaintiffs-Appellants,

v.

Francis X. McCORMACK, Clerk of the Circuit Court for
Milwaukee County, Harold A. Breier, Chief of Police
for the City of Milwaukee, and Michael S. Wolke,
Sheriff of Milwaukee County, Defendants-Respond-
ents.†

Court of Appeals

No. 80–051. Argued September 3, 1980.—Decided October 14, 1980.
(Also reported in 299 N.W.2d 279.)

† Petition to review denied.

For the appellant, the cause was submitted on the briefs of *Nathaniel D. Rothstein,* of Milwaukee, and oral argument by *Mr. Rothstein.*

For the respondent, the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, with whom on the brief was *Howard B. Klein,* assistant attorney general, and oral argument by *Margie Moeller,* assistant attorney general.

Before Decker, C.J., Moser, P.J., and Cannon, J.

DECKER, C.J.   Plaintiffs challenge the validity of sec. 969.12(1) and (2), Stats., as amended by sec. 1121m, ch. 34, Laws of 1979, which eliminates corporate sureties and sureties for profit for criminal bail bonds. The trial court held that the legislative act was a proper exercise of the state's police power, violative of neither the fourteenth amendment of the United States Constitution nor article I, section 1 of the Wisconsin Constitution, and vacated a temporary restraining order staying enforcement of the statute. We agree and affirm.

Prior to vacation of the temporary restraining order, plaintiff Meiroff-Kahn was a corporation lawfully engaged in the criminal bail bond business. Meiroff-Kahn arranged with surety companies for the posting of a bond in an amount required for the release of a criminal defendant. Defendants were charged a nonrefundable ten percent of this amount, and plaintiff guaranteed the surety companies full indemnification if a bond was forfeited because of a defendant's noncompliance with bail conditions. To minimize such indemnification payments, Meiroff-Kahn dealt only with defendants likely to comply with bail bond conditions, informed them of court dates and other bail conditions, and occasionally requested release from bonds where defendants exhibited potential noncompliance. The individual plaintiffs wrote bonds on behalf of Meiroff-Kahn and the surety companies.

Before amendment by ch. 34, Laws of 1979, sec. 969.12 (1) and (2), Stats., provided:

969.12 Sureties. (1) Every surety, except a corporate surety, shall be a resident of the state.

(2) A corporate surety shall be licensed to do business in the state and the commissioner of insurance shall file with the clerk in each county a list of corporate sureties so licensed.

As amended, sec. 969.12(1) and (2), Stats., now reads:

969.12 (1) Every surety under this chapter, except a surety under s. 345.61, shall be a resident of the state.

(2) A surety under this chapter shall be a natural person, except a surety under s. 345.61. No surety under this chapter may be compensated for acting as such a surety.

All counsel agree that the amendments effectively put plaintiffs out of the criminal bail bond business.

The state's police power has been defined as "the inherent power of government to promote the general welfare." *State v. Interstate Blood Bank, Inc.*, 65 Wis.2d 482, 490, 222 N.W.2d 912, 916 (1974). This power is broad, and includes the right to regulate the use of property and the conduct of business. *Chicago & North Western Railway v. La Follette*, 43 Wis.2d 631, 644, 169 N.W.2d 441, 447 (1969) (quoting *Nebbia v. New York*, 291 U.S. 502, 524 (1934)). It is a well-settled rule that "[i]n the exercise of its police power, the state may forbid, as inimical to the public welfare, the prosecution of a particular type of business, or regulate a business in such manner as to abate evils deemed to arise from its pursuit." *Great Atlantic & Pacific Tea Co. v. Grosjean*, 301 U.S. 412, 425–26 (1937). *See also John F. Jelke Co. v. Emery*, 193 Wis. 311, 318, 214 N.W. 369, 371–72 (1927); 16A Am. Jur.2d *Constitutional Law* §432 (1979). Our supreme court has held that:

[O]nce within the area of proper exercise of police power, it is for the legislature to determine what regulations, restraints or prohibitions are reasonably required to protect the public safety and only the abrogation of a basic and substantial individual liberty would justify judicial intervention to set aside the legislative enactments. *Bisenius v. Karns,* 42 Wis.2d 42, 54, 165 N.W.2d 377, 383 (1969).

Plaintiffs contend that judicial intervention is needed because the statute as amended deprives them of property without due process of law and of equal protection of the laws contrary to the fourteenth amendment of the United States Constitution and article I, section 1 of the Wisconsin Constitution.[1] When the exercise of the police power is challenged on due process grounds, "[t]he test is whether the means chosen have a reasonable and rational relationship to the purpose or object of the enactment; if it has, and the object is a real and proper one, the exercise of the police power is valid." *State v. Jackman,* 60 Wis.2d 700, 705, 211 N.W.2d 480, 484 (1973). *See also Chicago & North Western Railway v. La Follette, supra,* at 645, 169 N.W.2d at 447 (quoting *Nebbia v. New York, supra*).

A similar test is applied to an equal protection challenge:

A classification in police power means will be sustained if there is a reasonable and practical ground for the classification, even though some other classification might appear to be more in accord with general welfare. If the classification is reasonable and practical in relation to the objective, that is sufficient and doubts must

---

[1] The freedoms preserved by Wis. Const., art. I, sec. 1 are substantially equivalent to those preserved by the due process and equal protection clauses of U. S. Const., amend. XIV, with the Wisconsin Constitution placing no greater restriction on the exercise of the police power. *Chicago & N.W. Ry. v. La Follette,* 43 Wis.2d 631, 643, 169 N.W.2d 441, 446 (1969).

be resolved in favor of the reasonableness of the classification. *State v. Jackman, supra,* at 705–06, 211 N.W.2d at 484. *See also Stanhope v. Brown County,* 90 Wis.2d 823, 837, 280 N.W.2d 711, 716 (1979) ; *Wisconsin Bingo Supply & Equipment Co. v. Bingo Control Board,* 88 Wis.2d 293, 307, 276 N.W.2d 716, 722 (1979).

Statutes are presumed to be constitutional, and those challenging a statute must prove unconstitutionality beyond a reasonable doubt. *Laufenberg v. Cosmetology Examining Board,* 87 Wis.2d 175, 181, 274 N.W.2d 618, 621 (1979). Under the above tests, this presumption is not overcome unless the challenger proves that no reasonable basis exists for the exercise of the police power. *Id.; Chicago & North Western Railway v. La Follette, supra,* at 646, 169 N.W.2d at 448. Stated conversely, a challenged statute must be sustained if there is any reasonable basis for its enactment. *Clark Oil & Refining Corp. v. Tomah,* 30 Wis.2d 547, 554, 141 N.W.2d 299, 302 (1966).

The due process question raised here is whether the legislature could, in the exercise of its police power, reasonably conclude that outlawing the bail bonding business is in furtherance of the public welfare. None of the parties to this appeal question the public interest inherent in bail considerations, the purpose of bail being "to assure the appearance of a defendant when it is his or her duty to appear to answer a criminal prosecution." Sec. 969.01(4), Stats. Consonant with this public interest, the legislature has prescribed those factors which a court must consider when exercising its discretion in determining the amount and conditions of bail. After all relevant data, including the ability of an accused to give bail, has been considered by a court, and the amount of bail has been judicially determined, the commercial bail

bondsman subverts the entire process by facilitating the release of an accused, determined to be an economic "good risk," for a nonrefundable one-tenth of the judicially determined amount. This denigration of the court's discretion in determining bail has been recognized by the United States Supreme Court: "[P]rofessional bondsmen, and not the courts, exercise . . . significant control over the actual workings of the bail system," *Schilb v. Kuebel,* 404 U.S. 357, 360 (1971)[2], and is colorfully described in *Pannell v. United States,* 320 F.2d 698, 699 (D.C. Cir. 1963) (Wright, J., concurring) :

The effect of such a system is that the professional bondsmen hold the keys to the jail in their pockets. They determine for whom they will act as surety—who in their judgment is a good risk. The bad risks, in the bondsmen's judgment, and the ones who are unable to pay the bondsmen's fees, remain in jail. The court and the commissioner are relegated to the relatively unimportant chore of fixing the amount of bail.

*See also Stephens v. Bonding Association,* 538 S.W.2d 580 (1976), where the Kentucky Supreme Court sustained a statute expressly outlawing the commercial bail bondsman: "The financial condition of the defendant should not be a determining factor in his relationship to

[2] Plaintiffs contend that *Schilb v. Kuebel* is inapplicable to this appeal because the Illinois statute challenged and sustained in that case did not expressly outlaw the criminal bail bondsman. The Illinois statute allows defendants to post ten percent of the face amount of their bonds with the clerk of courts, and upon satisfaction of the terms of their bonds, allows them to recover ninety percent of the amount deposited. Under this statute, the cost of release is now only one percent of the face amount of the bail bond, rather than ten percent. The professional bail bondsman has effectively been eliminated and replaced by the clerk of courts. *See Schilb v. Kuebel, supra,* at 373–381 (Douglas, J., dissenting on the ground that the statute still impermissibly discriminates based upon who is able to afford the one percent cost).

the criminal process. The result of the checkbook system of criminal justice is the creation of a lucrative private business." *Id.* at 582.[3]

Legislation protecting the integrity of judicial bail determinations, which are designed to assure the appearance of defendants, is clearly in the public interest, and the elimination of professional bondsmen in Wisconsin is a means rationally related to this end. *See State v. Jackman, supra.* Just as the legislature can set guidelines for courts to follow in determining bail, it is within the province of the legislature's police power to regulate who shall determine bail.

While we note that counsel have stipulated that the plaintiffs at all times conducted their business lawfully, criticism has been currently leveled against the commercial bail bonding system. *See, e.g.,* ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Pretrial Release §5.4, Commentary at 62 (1968):

> The bail bond business is subject to a variety of allegations of corruption. The charges range from alleged tie-ins with police and court officials, involving kickbacks for steering defendants to particular bondsmen, to collusion and corruption aimed at setting aside for-

---

[3] Plaintiffs contend that *Stephens v. Bonding Ass'n* is inapplicable to this appeal because the statute was directed at eliminating corruption and abuses attendant in Kentucky but absent in Wisconsin. While this may be so *(see Johnson Bonding Co. v. Commonwealth,* 420 F. Supp. 331, 335 (E.D. Ky. 1976)), the Kentucky Supreme Court rested its decision on the basis of elimination of the "checkbook system of justice," and quoted from *Schilb v. Kuebel, supra,* and *Parnell v. United States, supra.* Plaintiffs' attempt to distinguish *Stephens v. Bonding Ass'n* from the instant case addresses only one possible reasonable basis for the challenged legislation, and clearly does not discharge their burden of proving that *no* reasonable basis exists. *See Laufenburg v. Cosm. Exam. Bd., supra; Clark Oil & Ref. Corp. v. Tomah, supra.*

feitures of bonds where the defendants have failed to appear.

The legislature may have reasonably and rationally considered the commercial bail bonding system's potential for abuse in amending sec. 969.12(1) and (2), Stats. The record is devoid of a showing that no public interest is served by elimination of bondsmen for profit, and plaintiffs have not met their due process burden of showing that no reasonable basis exists for the statute as amended.

On equal protection grounds, plaintiffs object to the statutory distinction between individuals who gratuitously post bond and others, including corporate sureties, who operate for profit. Plaintiffs further object to the statutory distinction between criminal bail bondsmen and surety companies guaranteeing traffic arrest bonds under sec. 345.61, Stats.[4]

Constitutionally permissible grounds exist for the distinction between individuals who gratuitously post bonds and others who post bonds for profit. The gratuitous individual bailor is not able to secure a defendant's freedom for one-tenth of the bail amount determined necessary by a court of law, and thus cannot subvert the judicial process. He or she also does not have the same business opportunity or business motive to corrupt police and court officials as does the professional bondsman. The classification challenged is reasonable in relation to the objective sought, protection of the integrity of judicial bail determinations. *See State v. Jackman, supra.*

The challenged statute does not outlaw corporate sureties who pursuant to sec. 345.61, Stats., become sureties for guaranteed traffic arrest bond certificates issued by

---

[4] Plaintiff Meiroff-Kahn also underwrites and executes sec. 345.61, Stats., traffic arrest bonds. This aspect of its business is unaffected by sec. 969.12(1) and (2) as amended.

automobile associations, clubs or liability insurers. Due to the stringent limitations placed on this business by sec. 345.61, however, reasonable grounds exist for distinguishing it from the criminal bail bond business. Under sec. 345.61(1)(a), a corporate surety may not guarantee more than $200 worth of traffic bonds per year issued by a given association, club or insurer. This closely restricted business designed to assure payment of a forfeiture is unlikely to seriously subvert the judicial process, and the small amounts involved are not likely to spawn corruption and impropriety.

Plaintiffs have argued the social utility of the commercial bail bond business before this court both in their briefs and in oral argument. These arguments are addressed to the wrong forum. To quote the United States Supreme Court:

[S]uch arguments are properly addressed to the legislature, not to us. We refuse to sit as a "superlegislature to weigh the wisdom of legislation," and we emphatically refuse to go back to the time when courts used the Due Process Clause "to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." . . . . The [statute challenged] may be wise or unwise. But relief, if any be needed, lies not with us but with the body constituted to pass laws for the State . . . . *Ferguson v. Skrupa,* 372 U.S. 726, 731–32 (1963) (footnotes omitted).

Because plaintiffs have not met their burden of proving the non-existence of any rational basis to support sec. 969.12(1) and (2), Stats., as amended, their challenge must fail.

*By the Court.*—Judgment affirmed.