STATE, Plaintiff-Appellant, v. VILLAGE OF LAKE DELTON, and others, Defendant-Respondents.†

Court of Appeals

*No. 77–722. Argued September 20, 1978.—*
*Decided November 21, 1979.*
(Also reported in 286 N.W.2d 622.)

† Petition to review denied.

For the plaintiff-appellant there were briefs by *Bronson C. La Follette,* attorney general, and *Robert B. McConnel,* assistant attorney general, and oral argument by *Robert B. McConnel,* assistant attorney general.

For the defendant-respondent Village of Lake Delton there was a brief by *Francis R. Bannen* and *Francis R. Bannen, S.C.,* of Wisconsin Dells, and oral argument by *Francis R. Bannen.*

For the defendant-respondent Town of Delton the cause was submitted on the brief of *Robert L. Greenhalgh* and *Greenhalgh, Jenks & Dithmar* of Baraboo.

For the defendant-respondent Tommy Bartlett, Inc. there was a brief by *Ralph J. Ehlinger, Dennis L. Fisher* and *Hoyt, Greene & Meissner, S.C.* of Milwaukee, and *Phillip Owens* and *Rogers & Owens* of Portage, and oral argument by *Ralph J. Ehlinger.*

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

BABLITCH, J. This is an appeal from a judgment of the circuit court for Sauk County dismissing the state's complaint for declaratory and injunctive relief. The suit was brought on behalf of the Department of Natural Resources (DNR) to enjoin the enforcement of an ordinance regulating the use of Lake Delton. The issues on appeal are whether the ordinance violates the public trust doctrine and the Wisconsin or federal constitutions, and whether it was enacted within the scope of the pertinent statutory authority.

The respondents Village of Lake Delton (village) and Town of Delton (town) have enacted an ordinance which they contend is necessary and reasonable to protect a particular historical use of Lake Delton, upon the continuation of which their economies—and those of surrounding tourist-catering communities—depend. The use is the presentation of public water ski exhibitions, which have attracted many thousands of tourists to the area each summer for many years.

In effect, the ordinance "zones" a small area of Lake Delton which has been used for public water ski exhibitions performed by respondent Tommy Bartlett Water Show, Inc. (Bartlett) for more than 24 years, and provides for the exclusive use of that area by water exhibition licensees during the times specified in the licenses. The area is unrestricted during all other times. To date, only one such license has been applied for or granted. That license was issued by the municipalities to Bartlett. The license grants Bartlett the exclusive use of the restricted area during three 50-minute periods per day

during the summer months, which are the times traditionally consumed by the performances.

The state contends that the ordinance is a "scheme to sell" Lake Delton to a private commercial enterprise, and that its prohibition against uses other than the licensee's during the specified times destroys public rights in the area, in violation of the public trust doctrine. It also contends that the ordinance was enacted without statutory authority.

The respondents contend that the ordinance represents a miniscule and necessary intrusion on some public rights in the zoned area in order to preserve the safety, legality and continuing existence of a use for which a great public demand has been demonstrated, and which will be destroyed if the ordinance falls. It cites as its statutory authority sec. 30.77(3), Stats., which empowers municipalities to enact local boating regulations under certain conditions discussed later in this opinion, and sec. 61.34(1), which embodies the general grant of police powers to villages.[1]

The constitutional and statutory issues presented by this appeal intertwine, though they are legally distinct. For the sake of clarity, we will first summarize the facts leading to the enactment of the ordinance, most of which have been stipulated. We will then examine the design of the ordinance, and address the constitutional and statutory issues in that order.

## I.

### FACTUAL BACKGROUND

Lake Delton is an artificial lake located wholly within the boundaries of the village and town, both in Sauk County, Wisconsin. It has a surface area of 254 acres,

---

[1] Identical powers are conferred upon towns pursuant to sec. 60.18(12), Stats.

and a maximum depth of 16 feet. The lake is within the tourist area of Baraboo, Wisconsin Dells and Devils Lake. This area attracts a great number of tourists during the summer. During those months Lake Delton is used heavily for a variety of recreational purposes.

The village and town have a combined population of approximately 2,141 permanent residents. A large number of primarily seasonal commercial establishments are located along the shoreline of Lake Delton. These include resorts, water craft rentals, amphibious tours, a sea plane facility providing plane rides over the area, and a water ski exhibition establishment owned and operated by Bartlett.

Bartlett owns and rents land on the northerly shore of a small natural bay or "finger" of Lake Delton. The average depth of this bay is three feet. The Bartlett water show has been performed daily within the bay every summer season since 1953. Bartlett maintains bleachers, a stage, a pier, a dock, lighting equipment, a motel and a restaurant on this land. It also maintains two wooden water ski jumps in the bay, which are located approximately 60 and 85 feet, respectively, from shore.

The Bartlett Water Show is the second most popular tourist attraction in the Wisconsin Dells-Lake Delton area. It presents three 50-minute shows each day during the summer season, at 1:00, 5:00 and 8:30 p.m. In 1975 approximately 220,000 persons paid between $2.25 and $6.50 to watch performances from bleachers on land owned by Bartlett adjacent to the exhibition area. The testimony established that nonpaying viewers were able to watch the performances from other areas of the lake and shoreline and did so regularly. The average daily attendance of paying patrons was 2,600, with an average of 1,500 attending the 8:30 p.m. performance. The gross revenue for that season was over $900,000. In 1976, the number of paying viewers was over 235,000,

and the gross revenue was over $1,000,000. In 1975, Bartlett paid Wisconsin sales taxes of over $36,000 and substantial local property taxes.

The show consists of synchronized acrobatics and "trick" water skiing by paid performers. The show regularly includes the operation of high horsepower motor boats which tow between one and five performers at speeds ranging from 16 to 40 miles per hour. The wooden jumps are used for long and short distance trick jumping by performers in groups of as many as four persons. The performers use ski tows between 60 and 75 feet in length. The jumps are also used by high horsepower motor boats which leap into the air by running up the jumps.

The parties agree, and the trial court found, that the presence of boats or other obstructions in the performance area during the show would be hazardous for performers and non-performers alike. Their presence would also render the performances unlawful, since motor boats would pass within 100 feet of "other users" in violation of state boating regulations contained in secs. 30.66(3), 30.68(5), and 30.69(3), Stats.

On July 4, 1975, five individuals positioned two boats near the jumps used in the show and refused to leave on request of Bartlett employees and law enforcement officers. As a result, the show was delayed for over an hour. The individuals were ultimately arrested for disorderly conduct. This incident received considerable statewide publicity, as did the subsequent lawsuit they filed in federal court claiming violation of their constitutional rights.

The incident prompted a meeting between representatives of the village and Bartlett to discuss actual and potential conflicts between the show and other persons using the lake. Subsequent to the meeting, the village and town drafted a proposed ordinance regulating the use of Lake Delton and submitted it to the DNR for an "ad-

visory review" pursuant to sec. 30.77, Stats. The DNR responded by letter dated November 4, 1975, which contained several criticisms of the ordinance, and made suggestions for changes.

Second and third drafts of the ordinance, incorporating the suggestions, were submitted to the DNR. By letter dated February 16, 1976, the DNR stated that the third version of the ordinance appeared consistent with the applicable statutes. This version was enacted by the village on April 12, 1976 and by the town on May 4, 1976. It became effective on May 12, 1976. On that date Bartlett applied for and was granted a license to operate a water ski exhibition show in the restricted area specified in the ordinance. The license grants Bartlett the exclusive use of the area during three 50-minute periods at 1:00, 5:00, and 8:30 p.m. each day from approximately May 27 through September 17 of the years 1976 through 1979. Pursuant to the ordinance, Bartlett pays an annual license fee of $100.

By letter dated May 20, 1976, the DNR withdrew the findings contained in its letter of February 16, stating that it had re-reviewed the ordinance because of "the recent public controversy" concerning it, and had concluded that "the grant of exclusive rights to use a portion of Lake Delton to a licensee . . . does not fully recognize the rights of citizens of the State to navigate on Lake Delton." The letter asserted, without specifying why, that the ordinance was inconsistent with the statutes. It also stated:

[T]he ordinance as presently drafted raises constitutional issues concerning the authority of a municipality to establish exclusive use zones for certain classes of activities and for charging of a fee for utilization of such an exclusive use zone.

This action for declaratory judgment was commenced at the request of the DNR, on May 21, 1976, the day after the date of its letter.

Trial was held on March 28, 1977. Judgment was entered February 27, 1978, declaring the ordinance to be valid and constitutional and dismissing the complaint.

## II.

### THE ORDINANCE

The ordinance cites as its purpose the regulation of "water traffic, boating and water sports upon the waters of Lake Delton." It consists of a preamble and four substantive sections. Part I adopts verbatim the statutory boating regulations contained in secs. 30.50 through 30.71, Stats. Part II, which is the focal point of this controversy, designates a "water exhibition restricted area" of approximately eight acres within a portion of the bay historically used by the Bartlett Water Show and prohibits public water ski exhibitions unless the sponsor of the exhibition is licensed under the ordinance to operate in such an area. Part III establishes another area of the lake as a "public swimming area" and prohibits the operation of any boat therein. Part IV requires that the boundaries of the public swimming area and of any water exhibition restricted area be marked by waterway markers, and sets forth civil forfeitures for violations of the ordinance. The ordinance also provides that the municipalities may, on application, establish additional swimming and exhibition areas in the interest of public health, safety and welfare.

The water exhibition restricted area described in the ordinance varies in width from approximately 175 feet to 400 feet, and is smaller than the area historically used by Bartlett in its shows. The bay within which the restricted area is located varies in width from about 200 feet to 450 feet. A portion of the northern boundary of the restricted area is contiguous to the land owned and

leased by Bartlett, and upon which its bleachers are located. An open channel of water lies outside the restricted area along a portion of its northerly boundary and along the entire portion of its southerly boundary, through which watercraft may freely travel at all times. The ordinance declares that the restricted area so described is a "shallow area" which is "suitable for use as a water exhibition restricted area by reason of its location in a portion of Lake Delton where conflicts among water sports can be minimized."

Other sections of Part II set forth various regulations concerning the use of the restricted area by a licensee,[2] and criteria for granting licenses.[3] They provide that the annual license fee of $100 "shall be used to defray the cost of administering this ordinance," and that if two or more applications are made for use of the same water ski restricted area a public hearing must be held at which the licensing authority must "consider the relative value to the community and public of the proposed uses."

The essence of the state's argument is that Parts I, III and IV of the ordinance are camouflage or "window dressing" to mask the real purpose of the ordinance, set forth in Part II. The state's primary attack is on the first section of Part II, which reads in part:

Section 1. *Water Exhibition Regulations.* No person shall conduct or participate in a water ski tournament, competition, exhibition or trial therefor *which is sponsored or operated as a public presentation* (hereinafter "water exhibition"), unless the water exhibition and its sponsor are duly licensed hereunder to operate in a water

---

[2] The licensee is required, for example, to maintain the ski jumps, pickup and drop-off areas, and to provide adequate lighting.

[3] The licensing authority is required to consider the license applicant's character, experience, financial responsibility and technical competence, together with the suitability of the proposed exhibition for the restricted area and the general public health, safety and welfare.

exhibition restricted area. Between the dates and during the hours when exclusive use of a water exhibition restricted area by a water exhibition licensee is authorized, the use of the navigable waters of the area by persons other than law enforcement officials and the water exhibition licensee is prohibited. (Emphasis added.)

The state cites the quoted language as proof that the purpose of the ordinance is the "complete exclusion of the public," and characterizes the ordinance as "a scheme to sell a part of Lake Delton to a commercial enterprise for an unspecified period of time and for an established fee." It contends that denial of all competing uses by any other member of the public during the times provided in the license is "as much a destruction" of the rights of the public in and to the navigable waters of the state as the draining of a lake for the benefit of a private agricultural concern held invalid in *Priewe v. Wisconsin State Land & Imp. Co.*, 103 Wis. 537, 551–52, 79 N.W. 780, 782 (1899). It argues that such an interference with public rights to the free use of the lake for all legal purposes cannot be tolerated for any period of time as to any portion of any navigable body.

At the outset, we do not agree with the state's characterization of the ordinance as having a single purpose. Though the economic benefit it may confer upon a commercial licensee such as Bartlett is at once apparent, a fair reading of the ordinance discloses many additional benefits flowing to other members of the public by virtue of its existence. The ordinance licenses water exhibitions *only* when they are "for public presentation." The ordinance is founded upon the expectation that many persons will form an audience for the performances. The enjoyment by the audience of this particular use of the lake, both by those persons who pay for admission to a bleacher area owned by a licensee and by those who view from other points, depends upon the ability of the performers to perform unimpeded by obstacles in their paths. An ordinance which prohibits persons from enter-

ing the performance area during the performance thus benefits those members of the public—over 200,000 per year—who wish to see it.

The trial court found that the economy of the entire Wisconsin Dells-Lake Delton area, which is comprised of interdependent businesses, is heavily dependent upon the summer tourist industry. It also found that the Bartlett Water Show was one of only two attractions in that area which provides evening entertainment for children as well as for adults. To the extent that the entertainment provided by preplanned water exhibitions attracts tourists into the area, an ordinance prohibiting disruptive intrusions into the exhibition area during performances confers indirect economic benefits on businesses other than the licensee. Those benefits generate tax revenues at state and local levels, benefiting the public in general.

Consequently, the ordinance confers benefits of different types—economic, safety, and recreational—upon a significant portion of the public. The cost of those benefits is the temporary exclusion of the public from the physical use of that portion of the surface of the lake reasonably necessary to accommodate a public water exhibition which, by its nature, requires exclusivity if it is to take place.

The questions are whether that cost is permissible under the constitution and the public trust doctrine, and whether the legislature has delegated authority to local municipalities to exact it.

## PUBLIC TRUST DOCTRINE

The public trust doctrine relative to the navigable waters of the state is one of the oldest legal doctrines in the state's case law. Its historical development was painstakingly traced by Justice Currie in *Muench v. Public Service Comm.*, 261 Wis. 492, 53 N.W.2d 514 (1951), *aff'd. on reh.*, 55 N.W.2d 40 (1952). Though the source

of this doctrine in other states has been said to lie in the common law imported from England, under which the King held title to all navigable waters in trust for the people,[4] an additional source of the doctrine in this state is found in art. IX, sec. 1 of the Wisconsin Constitution, which adopted verbatim the language of the Northwest Ordinance of 1787. That section provides:

The state shall have concurrent jurisdiction on all rivers and lakes bordering on this state so far as such rivers or lakes shall form a common boundary to the state and any other state or territory now or hereafter to be formed, and bounded by the same; and the river Mississippi and the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, *shall be common highways and forever free,* as well to the inhabitants of the state as to the citizens of the United States, without any tax, impost, or duty therefor. (Emphasis supplied.)

In *Muench,* the supreme court recognized that the historical purpose of the trust and the "forever free" clause was to protect commercial navigation and the use of the navigable waters for pecuniary profit, as opposed to recreational navigation or recreational pursuits, such as hunting, which are "incident" to navigation.[5] 261 Wis.

---

[4] *See generally* Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention,* 68 Mich. L. Rev. 471 (1970). *See also Shively v. Bowlby,* 152 U.S. 1 (1894).

[5] *See also* Comment, *Role of Local Government in Water Law,* 1959 Wis. L. Rev. 117, 124–25, which states:

In the earlier days of the trust doctrine the interest the state was charged with safeguarding was mostly that of commercial navigation. Because of the great importance of the logging industry in the state a very generous test of navigability was adopted. . . . Once a stream is shown to be navigable it is presumed to be navigable and "forever free."

*See also Nekoosa-Edwards Paper Co. v. Railroad Comm.,* 201 Wis. 40, 43–46, 228 N.W. 144 (1930); *Sweeney v. Chicago, Milwaukee & St. Paul R'y. Co.,* 60 Wis. 60, 18 N.W. 756 (1884); *Wisconsin River Improvement Company v. Lyons,* 30 Wis. 61 (1872); *Barnes v. Racine,* 4 Wis. 474 (1854).

at 508, 515k, 515–l, 53 N.W.2d at 521, 55 N.W.2d at 45–46. It noted, however, that many Wisconsin cases had expanded the protection of the trust to purely recreational and nonpecuniary uses of the water,[6] and held:

The right of the citizens of the state to enjoy our navigable streams for recreational purposes, including the enjoyment of scenic beauty, is a legal right that is entitled to all the protection which is given financial rights. 261 Wis. at 511–512, 53 N.W.2d at 522.

The primary power to administer the trust for the enhancement of these public rights to use the waters for commercial and recreational purposes reposes in the legislature.[7] However, many cases recognize that this power may be delegated to other units of government, including municipalities, for purposes in furtherance of the trust.[8] Whether the power is exercised by the legislature or by a delegee it must be exercised for the benefit of the public. Efforts to serve or advance purely private interests to the detriment of the public interests protected by the trust are invalid.[9]

Perhaps the clearest example of such an attempt is found in the two early cases of *Priewe v. Wisconsin State Land & Imp. Co.*, 93 Wis. 534, 67 N.W. 918 (1896), 103 Wis. 537, 79 N.W. 780 (1899), upon which the state re-

---

[6] *See e.g., State v. Public Service Comm.*, 275 Wis. 112, 118, 81 N.W.2d 71 (1957); *Nekoosa-Edwards Paper Co. v. Railroad Comm.*, 201 Wis. 40, 228 N.W. 144 (1930); *Diana Shooting Club v. Husting*, 156 Wis. 261, 145 N.W. 816 (1914); *Willow River Club v. Wade*, 100 Wis. 86, 76 N.W. 273 (1898).

[7] *Ashwaubenon v. Public Service Comm.*, 22 Wis.2d 38, 125 N.W. 2d 647 (1963).

[8] *Wis. Environmental Decade, Inc. v. DNR*, 85 Wis.2d 518, 527, 534, 271 N.W.2d 69 (1978); *State v. Public Service Comm.*, 275 Wis. 112, 81 N.W.2d 71 (1957); *Muench v. Public Service Comm.*, 261 Wis. 492, 53 N.W.2d 514 (1951), *affd. on reh.* 55 N.W.2d 40 (1952).

[9] *Priewe v. Wisconsin State Land & Improvement Co.*, 93 Wis. 534, 67 N.W. 918 (1896), 103 Wis. 537, 79 N.W. 780 (1899); *Rossmiller v. State*, 114 Wis. 169, 89 N.W. 839 (1902).

lies. In 1891 the legislature passed a special act which conveyed to one John Reynolds title to the lands underlying Lake Muskego and Wind Lake and authorized him to drain the lakes. The act recited that its purpose was to preserve the public health and well-being of communities adjacent to these lakes. Reynolds transferred his interests to the defendant corporation, which he formed for the purpose of improving and selling land, and proceeded to drain the lakes.

The first *Priewe* case overruled the trial court's dismissal of a complaint brought by a riparian landowner. The court held that it was not bound by the legislature's declaration of purpose, and that the question whether the act was designed to accomplish some public good or merely to advance a private gain was a question to be determined by the court. It stated:

[T]he legislature had no power, under the guise of legislating for the public health, to authorize the destruction of the lake, and thereby create a nuisance, to the great injury of the plaintiff as [a] riparian owner, *for private purposes and for the sole benefit of private parties.* 93 Wis. at 552, 67 N.W. at 922. (Emphasis supplied.)

On remand the plaintiff prevailed. On appeal the supreme court repeated its earlier holding and said further:

Leaving out of view the pretense that the draining of the lake was for the purpose of promoting the public health, not a shadow of legal authority exists to justify the acts complained of. The legislature has no more authority to emancipate itself from the obligation resting upon it which was assumed at the commencement of its statehood, to preserve for the benefit of all the people forever the enjoyment of the navigable waters within its boundaries, than it has to donate the school fund or the state capitol to a private purpose. 103 Wis. at 549–550, 79 N.W. at 781.

The defendant was required to restore the lakes to their former condition.

The *Priewe* case established two vital principles of the public trust doctrine. First, the courts are not bound by declarations of public purposes underlying legislation which affects navigable waters. Second, if the purpose and effect of such legislation is solely to benefit a private interest, the legislation is void. These principles do not control the disposition of the case before us.

The ordinance in question does confer a benefit on the licensee who may be, as in this case, a private party with a commercial interest in the benefit. Its purposes, however, are far broader than the single and transparent purpose of the act struck down in *Priewe*. They include the preservation of safety, of order, of local tourist economies, and of the recreational pleasure of thousands of persons. These are all legitimate public purposes.[10] Moreover, the benefit conferred is revocable, and has but a slight and temporary effect on other public interests and rights. It does not destroy any such rights, but merely defers their exercise to other times or spaces on the lake.

In many cases the supreme court has upheld a variety of intrusions into the public waterways, sometimes in the service of commercial interests, even when such intru-

---

[10] Appellant's implications that the protection of local economies is an invalid purpose, or is entitled to no consideration in evaluating the ordinance, must be rejected. The supreme court has held that "the protection of economic interests of the general public falls within the scope of promotion of the general welfare, and thereby affords a basis for the exercise of the police power." *State ex rel. Miller v. Manders*, 2 Wis.2d 365, 371, 86 N.W.2d 469, 473 (1958). *See also State v. Ross*, 259 Wis. 379, 48 N.W.2d 460 (1951); *State ex rel. Saveland P. H. Corp. v. Wieland*, 269 Wis. 262, 69 N.W.2d 217 (1955); *State ex rel. Carter v. Harper*, 182 Wis. 148, 196 N.W. 451 (1923); *Namekagon Hydro Co. v. Federal Power Commission*, 216 F.2d 509 (7th Cir. 1954).

sions are permanent in nature and destructive of other interests protected by the trust. The test employed in each case has been a balancing test in which the court has weighed the harm done by the intrusion against the benefits conferred by allowing it.

In *Merwin v. Houghton,* 146 Wis. 398, 131 N.W. 838 (1911), the court upheld a proposal by drainage commissioners to drain and improve some 7,000 acres of land known as "the Trempealeau bottom" along the Mississippi River, against the claim of landowners protesting the loss of lakes and rivers within the areas which were used for hunting and fishing. The court found that the proposal would alleviate unsanitary conditions within the area, much of which was swamp and marshland, and improve navigation on the Trempealeau River by straightening its naturally circuitous route. The court conceded that the rights of hunting and fishing in the area would be adversely affected and that certain "lake expansions" of the river would be destroyed. It held, however, that those public interests must yield to other public interests served by the proposal:

Can it be said in the instant case that the state, in authorizing this drainage scheme, acting through the agency of a drainage commission, has infringed on the public rights of fishing and hunting in violation of the trust for the public upon which the state holds the beds to navigable waters? To constitute such an infringement of the rights of fishing and hunting it must appear from the facts and circumstances presented that there is an unauthorized impairment thereof in the light of the duty of the state to regulate other public interests. . . . True, hunting and fishing will be somewhat impaired in the navigable waters of the drainage district, but not to an extent amounting to a substantial infringement of the right, when considered in connection with the regulation and guarding of the other public interests here involved. 146 Wis. at 410, 131 N.W. at 841–42.

A concurring opinion by Chief Justice Winslow, joined by Justice Marshall, stressed the interest of commerce which would be served by the proposal.[1]

In *Milwaukee v. State,* 193 Wis. 423, 214 N.W. 820 (1927), the court entered "a new phase of the so-called trust doctrine." 193 Wis. at 428, 214 N.W. at 821. In 1909 the legislature had passed a special act ceding certain land underlying Lake Michigan to the City of Milwaukee for harbor purposes. The land extended 1,500 feet into the lake. In 1923 the legislature amended the act to declare a portion of the ceded land "unnecessary for purposes of navigation or other public purposes," and authorized the city to fill, reclaim, and convey that portion to "the owner or owners of the shore land adjacent thereto" in exchange for other shore lands which were necessary to complete the city's long-planned harbor project. The adjacent owner was the Illinois Steel Company, a private industrial corporation. It was authorized by the act to fill in the lake overlying the property conveyed to it and "in aid of commerce and navigation, to construct dock and wharf facilities on any of said land and to use any or all of said land for any proper purpose." 193 Wis. at 436, 214 N.W. at 824.

In a quiet title action brought by the city, the supreme court upheld the conveyance, framing the issue as follows:

[W]e are called upon to determine the right of Wisconsin . . . to cede to the metropolis of the state property held in trust by it, to promote the interests of navigation and commerce, with an authorization to convey a part of this trust property so ceded to a private industrial corpora-

---

[1] Justice Winslow observed: "The right of the state to better its navigable waterways is supreme. If there be a resulting impairment of the quality of the fishing in the navigable stream as improved, even to the point of practical extinction, this is a loss which the public must endure without complaint." *Merwin v. Houghton,* 146 Wis. 398, 411, 131 N.W. 838, 842 (1911).

tion, in order that the municipal project can be accomplished. 193 Wis. at 427, 214 N.W. at 821.

The court's holding rested upon the minimal impact of the fill on the rights of the public to use that particular portion of Lake Michigan, noting that all public uses then made of it could continue in the immediately adjacent areas. The court contrasted this intrusion with the major economic and other benefits to the city, the state, and interstate commerce which were expected from the completion of the harbor project. Though noting that the steel company was "a private corporation, operated for profit," the court said it was also "an important factor in the industrial life of the city and of the State." 193 Wis. at 450, 214 N.W. at 830. The court distinguished *Priewe, supra,* on the basis that the purpose of the conveyance to the steel company "is not a private one, but is public in its nature," 193 Wis. at 451, 214 N.W. at 830, and that the private interests benefited by the grant were "merely incidental to the procurement of the public interests." 193 Wis. at 456, 214 N.W. at 832.

The principle established by the *Merwin* and *Milwaukee* cases is that no single public interest in the use of navigable waters, though afforded the protection of the public trust doctrine, is absolute. Some public uses must yield if other public uses are to exist at all. The uses must be balanced and accommodated on a case by case basis. The principle has been reasserted in many decisions of the supreme court.

In *State v. Public Service Comm.,* 275 Wis. 112, 81 N.W.2d 71 (1957), the court upheld a legislative delegation of authority to the City of Madison to dredge and fill approximately four acres (or one and one-fourth percent) of Lake Wingra for use as a public park or "any other municipal purpose." 275 Wis. at 114, 81 N.W.2d at 72. It did so despite findings by the Public Service Commission, which had approved the plan, that the proposal would result in a reduction of the fish producing poten-

tial of the lake by 1,600 to 2,000 pounds per year and that the purposes of the plan to improve an existing park could be achieved by other, "although possibly not as desirable" methods. 275 Wis. at 114, 81 N.W.2d at 72. The court concluded that the plan did not violate the public trust doctrine because:

1. Public bodies will control the use of the area. 2. The area will be devoted to public purposes and open to the public. 3. The diminution of lake area will be very small when compared with the whole of Lake Wingra. 4. No one of the public uses of the lake as a lake will be destroyed or greatly impaired. 5. The disappointment of those members of the public who may desire to boat, fish, or swim in the area to be filled is negligible when compared with the greater convenience to be afforded those members of the public who use the city park. 275 Wis. at 118, 81 N.W.2d at 73–74.

The court applied the same reasoning in *Madison v. State*, 1 Wis.2d 252, 259–60, 83 N.W.2d 674 (1957), in upholding another proposal by the City of Madison to fill in six acres of Lake Monona upon which it planned to build a public theatre and civic center.

In *Ashwaubenon v. Public Service Comm.*, 22 Wis.2d 38, 125 N.W.2d 647 (1963), the court reversed a determination by the Public Service Commission that a local ordinance establishing a new bulkhead line in the Fox River, which would have the effect of allowing riparian owners to fill an area between the line and the existing shore of about 137 acres, was not in the public interest. The court recognized that the town's proposal would constitute a "greater intervention than has previously been approved by earlier decisions of this court," 22 Wis.2d at 50, 125 N.W.2d at 653, but interpreted sec. 30.11(2) as authorizing just such an invasion of the waters and held:

We do not find that the trust doctrine forecloses the legislature from this course. The standards prescribed by the legislature constitute adequate protection to the public and, thus, there is no neglect by the trustee of its responsibilities. 22 Wis.2d at 50, 125 N.W.2d at 654.

Other types of obstructions of and interferences with the public uses of the water have been approved when necessary to accomplish public purposes. These include wharves and piers,[12] log booms,[13] dams,[14] and bridges[15] placed in or over the water, so long as they do not materially obstruct navigation. When the necessity for such physical obstructions is shown, the court has held in effect that other users must accommodate them by navigating around them.

Nonphysical limitations on the public uses of waters have also been sustained. In *Menzer v. Elkhart Lake,* 51 Wis.2d 70, 186 N.W.2d 290 (1971), the supreme court held that an ordinance prohibiting the use of motor boats on a lake each summer Sunday did not violate the public trust doctrine. It also held that the doctrine was not violated by the state boat licensing requirement contained in sec. 30.51(1), Stats., which prohibits the operation of boats on state waters unless the boat is covered by a state-issued certificate, in *State v. Jackman,* 60 Wis.2d 700, 211 N.W.2d 480 (1973).

The purpose and effect of the ordinance at issue in this case must be evaluated in light of the principles set forth in the above cases, and also in light of the unique nature of the use it seeks to protect. Unlike other uses of the water, a water ski exhibition requires an exclusive use area. Like any form of theatre, it requires a stage in a known location, within a reasonable distance from the

[12] *The Wisconsin River Improvement Company v. Manson,* 43 Wis. 255 (1877). *See also,* sec. 30.13, Stats.

[13] *J. S. Keater Lumber Co. and others v. St. Croix Boom Corp.,* 72 Wis. 62, 38 N.W. 529 (1888).

[14] *Wisconsin River Improvement Company v. Manson,* 43 Wis. 255 (1877). *See also Wisconsin River Improvement Company v. Lyons,* 30 Wis. 61 (1872), secs. 31.04–31.08, Stats.

[15] *Captain Soma Boat Line v. Wisconsin Dells,* 79 Wis.2d 10, 255 N.W.2d 441 (1977). *See also Gates v. Northern Pacific R. Co.,* 64 Wis. 64, 24 N.W. 494 (1895); *Sweeney v. Chicago, Milwaukee & St. Paul R'y. Co.,* 60 Wis. 60, 18 N.W. 756 (1884), sec. 31.23, Stats.

anticipated audience, and a preplanned time of perform-
ance. If any one of these requirements is lacking, the
performance cannot take place. The ordinance is an at-
tempt to insure that the requirements are met.

The ordinance in effect combines the legally distinct
concepts of zoning and licensing. It designates what
amounts to a stage in an area of the lake particularly
suited to exhibitions and protects that area from intru-
sion by prohibiting anyone other than the licensee from
using it "between the dates and during the hours when
exclusive use of a water exhibition restricted area is
authorized." The state concludes from this language of
the ordinance that "the exclusion of the public could not
be plainer nor could it be more complete." We think the
argument overlooks the fact that the anticipated pres-
ence of the public as viewers is the foundation of the
regulation. Absent the established public demand for
water ski exhibitions, there would be no reason for a
regulation protecting the use. During the times of per-
formances, the viewers are participants in the licensee's
use of the water. Only persons who would interfere with
those performances by asserting a right to be on stage
during showtime are excluded.

The concept of surface water zoning is not a new one.[16]
It was within the contemplation of the legislative com-
mittee which drafted sec. 30.77, Stats., conferring on
municipalities the right to enact local boating regula-
tions.[17] Several sections of ch. 30, drafted by that com-

[16] *See* Kusler, *Carrying Capacity Controls For Recreation Water
Uses*, 1973 Wis. L. Rev. 1; G. Wilson, *Lake Zoning For Recreation*
(1964); J. Kusler, *Regulations To Reduce Conflicts Between Rec-
reation Water Uses: Wisconsin Department of Natural Resources,
Research Report No. 65*, (1970).

[17] The Report of the Interim Boating Committee to the 1959
Wisconsin Legislature, which was created by ch. 378, Laws of
1957, to propose legislation to regulate boating in Wisconsin lakes,
states at 28:

Some municipalities, in an attempt to resolve or avoid conflicts
between various water users, have resorted to area zoning, specific

mittee and in effect since 1959, specifically assume that "restricted use areas" will be established in Wisconsin waters, though the sections do not use the term "zone."[18] The Supreme Court of Minnesota upheld a municipal ordinance provision creating an area to be used exclusively for swimming under that state's public trust doctrine in *Nelson v. DeLong*, 213 Minn. 425, 7 N.W.2d 342 (1942). We find the reasoning of the court persuasive:

It must be obvious to everybody that the indiscriminate use of such a small area of water as is here involved by boats . . . and by bathers is apt to endanger the life and limb of those engaged in such uses and to give rise to clashes of interests, confusion, disorderly brawling, and breaches of the peace. The suppression of such evils is sufficient reason for regulation. 213 Minn. at 435, 7 N.W.2d at 348.

Though none of the sections of ch. 30 uses the term "license," several sections refer to "permits" or "authorization" for certain uses regulated by state and local governments including water ski exhibitions, competitions, tournaments and boat races.[19] It is obvious that

---

areas of water being set aside for swimmers, fishermen, skin divers, water skiers. . . . In the judgment of the committee this type of regulation has considerable merit if it is used in an equitable manner.

[18] Section 30.68(7), Stats., prohibits the operation of boats within areas designated as swimming areas or in "restricted use areas." Section 30.74(2) authorizes the department to establish a uniform marking system for a variety of water areas, including "restricted activity" areas. Section 30.78 authorizes municipalities to designate landing and takeoff areas for seaplanes, or to "prohibit such use of the waters altogether."

[19] Section 30.69(1)(b), Stats., exempts from the statutory regulations pertaining to water skiing in general "duly authorized water ski tournaments, competitions, exhibitions or trials therefor, where adequate lighting is provided." Section 30.51(2)(g) exempts from the statewide boat registration requirement boats present in the state for boat races "conducted pursuant to a permit from a town, village, city or an authorized agency of the U. S. government." *See also* sec. 30.62(7) which provides an identical exemption from the boat equipment requirements.

these activities share certain characteristics. Each connotes an organized and preplanned use of the waters. Each requires a relatively large area within which the high speed movement of several craft or skiers must be coordinated. Each can interfere with other uses of the waters and present safety hazards unless its time and place are regulated so as to avoid conflict with other users of the waters.

The state argues that a regulation designed to avoid such conflict by granting exclusive use to a licensee creates a "privilege" in the licensee and thereby violates the "forever free" provision of the constitution, relying on *State v. Jackman*, 60 Wis.2d 700, 211 N.W.2d 480 (1973). In that case the supreme court, in upholding the statewide boat licensing statute, held that the license fee imposed by the statute was not a "tax" or "impost" within the meaning of art. IX, sec. 1 of the Wisconsin Constitution, nor a "fee . . . for the use of navigable waters," since the fees were used to administer the boating regulations contained in ch. 30, Stats. 60 Wis.2d at 711, 211 N.W.2d at 487. The court stated:

The numbering of boats is not a true licensing system. Everyone who applies for a number and pays a fee is granted a number. The numbering system is not used to limit the number of persons who may participate in boating activities, nor do the applicants pass any test for boat-operating ability. The fee was not intended to grant permission to use the navigable waters. 60 Wis.2d at 711, 211 N.W.2d at 487.

While it is true that the licensing provisions in the instant ordinance differ from those at issue in *Jackman* in that they contemplate that licenses for water ski exhibitions will be granted based upon the stated criteria rather than indiscriminately to anyone who pays the fee, that fact is not dispositive of the constitutional issue. Viewed narrowly, the license provisions do not grant permission to use the waters, but rather grant permission to

engage at a predetermined place in a specific, and particularly dangerous, activity which is otherwise prohibited altogether by the ordinance.

In our view a regulation which apportions the use of a given space of water to the single use and user which the space can reasonably accommodate at a single time reflects the obvious law of physics that two objects cannot be in the same place at the same time. While from one perspective such a regulation confers a temporary privilege on the user, from another it merely provides a mechanism through which the user may exercise his right, held in common with all citizens, to use public property for a legitimate purpose.[20] The issue in any event does not turn upon the elusive and semantical distinction between "rights" and "privileges." For the appropriate questions, as the supreme court has made clear in the cases previously discussed, are whether the regulation has a legitimate public purpose and, if so, whether the means it employs to accomplish the purpose are reasonable. Under the circumstances of this case, we conclude that both questions must be answered in the affirmative.

The fact that a fee is charged to the licensee for the purpose of administering the ordinance is not violative of the "forever free" clause, as *Jackman, supra,* held. Nor does the fact that Bartlett charges an admission fee to

---

[20] Many such statutes and regulations govern the use of other public property such as public buildings and grounds and state forests and parks. *See, e.g.,* sec. 16.845, Stats. (manager of state facilities may grant application for use thereof notwithstanding admission fee charged to public) ; sec. 24.39, Stats. (commissioners of public lands empowered to grant leases of certain public lands and to grant easements and licenses to prospect for ore, etc.) ; sec. 26.06, Stats. (similar powers granted to DNR with respect to state park and forest lands) ; sec. 27.01, Stats. (leases of and easements to state park land). *See also* Wis. Adm. Code secs., Adm. 2.04 and NR 45.13; *State ex rel. Evjue v. Seyberth,* 9 Wis.2d 274, 101 N.W.2d 118 (1960).

its patrons translate into a "fee for the use of the waters," as the state claims. The admission fee is charged for the privilege to come upon the land owned or rented by Bartlett and to view its performances from its bleachers, and not for the use of the water.[21]

The state contends that since the ordinance does not set forth specific limitations on the hours or days which may be allotted to the licensee, or on the total number of licenses which may be granted, it is logically possible that the use of the restricted area could be limited to a privileged few licensees 24 hours each day. It also contends that since the ordinance authorizes the creation of additional restricted use areas, ultimately all public uses of the lake, could be permanently banned. These contentions overlook an inherent limitation in the design of the ordinance, arising out of the fact that it applies only to water ski exhibitions for public presentation. Properly construed, the ordinance authorizes a grant of exclusive use to a licensee only during the times of actual performances. Those times are necessarily dependent upon the public demand for such performances.

There is no suggestion in the record that the public demand for water ski shows on Lake Delton has ever exceeded the three 50-minute periods per day for which the area has been used each summer for more than two decades. There is no reason to suspect that the public demand will increase significantly in the future, or that the interference with competing public uses in the present or any other restricted area will ever exceed the nominal level represented by the only license issued thus far. The

[21] The supreme court upheld fees charged by the holder of a ferry franchise to public users in *Chapin v. Crusen*, 31 Wis. 209 (1872). *Accord, Wisconsin River Improvement Company v. Manson*, 43 Wis. 255 (1877) (tolls could be charged on lumber logs passing over or through improvements such as dams, piers and wharves erected by a corporation pursuant to a franchise to improve river.)

record shows that the local economies of these tourist communities depend upon many other commercial and recreational uses of Lake Delton. The requirement in the ordinance that public hearings be held in the event other applications for licenses are received or other restricted areas are sought ensures a forum for such interests to be expressed and weighed.

Finally, we cannot accept the state's assertion that the town and village were exclusively and improperly motivated to enact this ordinance by the desire to benefit a single, private, commercial corporation, or that the ordinance offends the due process and equal protection clauses of the United States Constitution. The state's reliance on *John F. Jelke Co. v. Emery*, 193 Wis. 311, 214 N.W. 369 (1927) and on *Coffee-Rich, Inc. v. Department of Agriculture*, 70 Wis.2d 265, 234 N.W.2d 270 (1975) is misplaced. In *Jelke* the supreme court held that the legislature had no power to enact a statute prohibiting the sale of oleomargarine in order to protect the dairy industry from competition. The court stated:

In some cases a proper exercise of the police power results in advantage to a particular class of citizens and to the disadvantage of others. When that is the principal purpose of the measure, courts will look behind even the declared intent of the legislature and relieve citizens against oppressive acts where the primary purpose is not the protection of the public health, safety or morals. 193 Wis. at 323, 214 N.W. at 373.

*Coffee-Rich* held that a statute prohibiting the use in restaurants of imitation dairy cream, while having the legitimate purpose of preventing consumer fraud, placed an undue burden on interstate commerce since the purpose could have been accomplished by methods short of total prohibition of the product. 70 Wis.2d at 278, 234 N.W.2d at 276. Both cases are readily distinguishable from this case.

Unlike the statute in *Jelke,* the ordinance confers benefits on many members of the public, as we have earlier observed. We believe its primary purpose is not to benefit Bartlett but to provide for the safe and lawful continuation of a historical use of the lake, the survival of which was threatened. Like the benefit conferred on the steel company in *Milwaukee v. State,* 193 Wis. 423, 214 N.W. 820 (1927), the benefit to Bartlett under this ordinance is a mere incident of the public purposes it seeks to serve. While Bartlett is the sole licensee to date, we have neither right nor reason to assume that if other applications are made they will be denied or treated unfairly.[22] *Omernik v. State,* 64 Wis.2d 6, 218 N.W.2d 734 (1974).

The state suggests no alternative means of securing the safe and orderly accommodation of competing uses served by the ordinance, and we can conceive of none. Unlike the statute in *Coffee-Rich,* which provided a remedy exceeding the scope of the problem it sought to resolve, this ordinance confines its remedy to the precise outlines of the need addressed. Its effect on the rights

[22] The state's contention that no one other than Bartlett would be eligible for a license, since it is the only riparian owner of land contiguous to the restricted area and thus the only individual authorized to maintain ski jumps on the bed of the waters pursuant to sec. 30.12, is not persuasive. The ordinance does not require a licensee to install ski jumps, but only to maintain those authorized in the license. Nor does the ordinance require an applicant to be an owner of adjacent lands. Bartlett does not own all the land in question but rents an undisclosed portion of it under undisclosed terms. There are many other riparian owners along the southern and western shorelines of the bay, whose lands are separated from the south and west boundaries of the restricted area by a channel ranging in width from only 25 to 150 feet. These owners or their lessees would have as much right under the statute as Bartlett to apply for a permit to place ski jumps in the present restricted area. Moreover, any applicant has the right to request that other restricted areas be established.

of others is negligible. Persons who wish to fish, swim or boat during the restricted times are free to do so on the remaining 246 acres of Lake Delton, and free at all other times to do so in the restricted area. Moreover, the testimony at trial indicated that the area in question was not traditionally in heavy use for such purposes, and that it was so used at any time by only a miniscule fraction of the hundreds of persons who, by daily attendance at the shows, demonstrated their preference for viewing the protected use. The rights of the viewing public are no less "incidents of navigation" than is, for instance, hunting. We believe they are entitled to the protection afforded them by this ordinance.

We hold that the ordinance does not offend the public trust doctrine nor the Wisconsin or federal constitutions.

## STATUTORY AUTHORITY

The ordinance recites that it is enacted pursuant to secs. 61.34 and 30.77, Stats. Section 61.34 embodies the general grant of powers to villages, and reads in part as follows:

61.34(1) GENERAL GRANT. Except as otherwise provided by law, the village board shall have the management and control of the village property, finances, highways, streets, *navigable waters,* and the public service, and shall have power to act for the government and good order of the village, for its commercial benefit and for the health, safety, welfare and convenience of the public, and may carry its powers into effect by *license,* regulation, suppression, borrowing, taxation, special assessment, appropriation, fine, imprisonment, and other necessary or convenient means. The powers hereby conferred shall be in addition to all other grants *and shall be limited only by express language.* (Emphasis supplied.)

Section 30.77, Stats., in its present form, provides in pertinent part:

(1) LOCAL REGULATION PROHIBITED; EXCEPTIONS. Sections 30.50 to 30.71 shall be uniform in operation throughout the state. No municipality may:

. . . .

(b) *Except as provided in subs. (2) and (3),* enact any local regulation which in any manner excludes any boat from the free use of the waters of this state or which pertains to the use, operation or equipment of boats or which governs any activity regulated by ss. 30.50 to 30.71.

. . . .

(3) LOCAL REGULATIONS. (a) Any town, village or city may, *in the interest of public health, safety or welfare,* adopt local reguations not contrary to or inconsistent with this chapter, relative to the equipment, use or operation of boats or relative to any activity regulated by ss. 30.60 to 30.71, but no such local regulation which in any manner pertains to the equipment, use or operation of a boat on an inland lake is valid unless all towns, cities and villages having jurisdiction on the waters of the lake have enacted an identical local regulation. (Emphasis supplied.)

Approximately three months prior to the enactment of sec. 30.77, Stats., the supreme court held that the general grant of power to cities under sec. 62.11(5), which is substantially identical to sec. 61.34(1), did not authorize the City of Madison to enact a boat licensing ordinance which prohibited the operation of boats on Madison lakes without a local license. *Madison v. Tolzmann,* 7 Wis.2d 570, 97 N.W.2d 513 (1959). The court said that no such power could be implied from that statute because "[t]he result of the licensing provision of the Madison ordinance is to exact a fee for the use of navigable waters, a matter of state-wide concern." 7 Wis.2d at 576, 97 N.W.2d at 517. It also held:

The free and unobstructed use of the navigable waters of the state under the trust doctrine is a matter of state-wide concern. We realize that trustees may delegate some authority. However, in this instance where the state is trustee not only for residents of Wisconsin but

for all of the people, such delegation of authority should be in clear and unmistakable language and cannot be implied from the language of a general statute delegating police power to cities. 7 Wis.2d at 575, 97 N.W.2d at 516.

Subsequently, the legislature enacted sections 30.50 through 30.80, Stats., which are entitled "Regulation of Boating." Most of these sections deal generally with the licensing and regulation of boating and other water sports on a statewide basis. In *State v. Jackman,* 60 Wis.2d 700, 211 N.W.2d 480 (1973), the supreme court upheld the statewide boat licensing requirements in sec. 30.51, Stats., and modified its holding in *Tolzmann* as follows:

The words "charge" for the use of navigable waters was unfortunately used in *Madison v. Tolzmann.* . . . . . . The licensing provision in the Madison ordinance was invalid *because it dealt with a matter of statewide concern.* The language that the "fee was for the use of navigable waters" is withdrawn. 60 Wis.2d at 711, 211 N.W.2d at 487. (Emphasis supplied.)

The supreme court recently reexamined the role of state and local governments with respect to water regulation in *Wis. Environmental Decade, Inc. v. DNR,* 85 Wis.2d 518, 271 N.W.2d 69 (1978). In considering the validity of an ordinance prohibiting the use of chemicals in city lakes for weed control, the court stated that a local exercise of the general police power "is not rendered invalid and constitutionally defective merely because it deals with a matter of state-wide concern." 85 Wis.2d at 533, 271 N.W.2d at 76.

As a general matter, the police power of the state which may be constitutionally delegated by the legislature and legitimately exercised by municipalities extends to matters of public safety, health, and general welfare. More specifically, particularly in light of the express declaration of sec. 62.11(5), Stats., that "[e]xcept as elsewhere in the statutes specifically provided, the council shall have the management and control of . . . navigable waters. . . ." the legislature may legitimately delegate au-

thority to local units of government to act in matters involving the state's "public trust" duties—provided that the delegation is in furtherance of the trust and will not block the advancement of paramount interests. 85 Wis.2d at 533–34, 271 N.W.2d at 76.

The court concluded that the power to prohibit chemical weed control was one which the legislature could properly delegate to cities and "therefore is one which the city now possesses under sec. 62.11(5), Stats." unless there was an express or implied revocation of that power in other sections of the statutes. 85 Wis.2d at 534, 271 N.W.2d at 76. It found an implied revocation of the local power in sec. 144.025(2)(i), which confers the power to "supervise chemical treatment of waters" on the DNR. The court noted that under sec. 144.025(1), the legislature had designated the DNR as "the central unit of state government" with respect to water pollution abatement throughout the state, 85 Wis.2d at 536, 271 N.W.2d at 77, as well as in other areas of water controls, and held that the DNR's power to supervise chemical treatment was "logically inconsistent" with the city's power to prevent it. 85 Wis.2d at 535, 271 N.W.2d at 77.

The state relies on *Tolzmann, Jackman* and *Wis. Environmental Decade* in contending that the ordinance here at issue regulates a matter of statewide concern, and thus exceeds the power delegated under secs. 30.77 and 61.34(1). We do not agree with this contention.

Section 30.77 was upheld in its original form, which authorized local boating regulations "in the interest of public health or safety," in the case of *Menzer v. Village of Elkhart Lake*, 51 Wis.2d 70, 186 N.W.2d 290 (1971). The court held that the statutory standards set forth in the statute were "minimally adequate" guidelines for the exercise of the delegated power:

Here the safeguarding of the public interest and the trust are sought legislatively to be insured by three requirements: That the ordinance . . . be (1) a local regulation;

(2) in conformity and not inconsistent with the statute; and (3) in the interest of public health and safety. The question is close and something less than "clear and unmistakable language" has been here used. However, the phrase "in the interest of public health or safety" does establish a limit and guideline. 51 Wis.2d at 84, 186 N.W.2d at 297.

The court held that the ordinance banning motor boating on Sundays did not violate the public trust doctrine, that it was "local" and that it was "not inconsistent with the statute." 51 Wis.2d at 84, 186 N.W.2d at 297.

In 1973 the legislature amended the statute[23] to broaden the statutory grant of authority by adding "welfare" to the public interests designed to be served by the local regulation. It also added a requirement that a regulation passed pursuant to the statute must be given an "advisory review" by the DNR prior to its adoption.[24] Significantly, the legislature did not give the department a veto power over local regulations subject to its review. Nor did it grant to the DNR the comprehensive supervisory role with respect to boating regulations assigned it under sec. 144.025, Stats.[25] Section 144.025 was enacted as a part of ch. 301, Laws of 1973, during the same

[23] Ch. 203, Laws of 1973.

[24] The pertinent portion of the added language provides:

Local regulations pertaining to equipment, use or operation of boats on inland lakes shall be subject to advisory review by the department. . . . Advisory reports as to town, village or city regulation of equipment, use or operation of boats on inland lakes shall be based on consideration of the effect of the local regulation on the state from the stand-point of uniformity and enforcement *and* on the affected town, village or city *in view of pertinent local conditions;* shall state in what regard such regulations are deemed consistent or inconsistent with this chapter as to public health, safety or welfare; and shall be accompanied by *suggested changes,* if any. (Emphasis supplied.)

[25] Section 144.025 (1) provides in part:

STATEMENT OF POLICY AND PURPOSE. The department of natural resources shall serve as the central unit of state government to protect, maintain and improve the quality and management of the waters of the state, ground and surface, public and

session of the legislature in which the boating regulation statute was amended. The legislature's assignment to the DNR of a purely advisory role in relation to local boating regulations evinces a legislative intention to vest in local government the power to regulate boating activities on navigable waters within their jurisdictions, so long as the regulations are consistent with the statutory scheme. The statutory role of the DNR is to provide a clearing house for all local regulations, and to advise local governments of potential conflicts. It is required by the statute to "state in what regard such local regulations are deemed consistent or inconsistent with this chapter." It has not done so in this case.

The state points to no specific statutory provision with which the ordinance is inconsistent. It argues that the legislative intent expressed in the chapter as a whole is to provide for the free use of all navigable waters in the state by all members of the public, and that foreclosing a portion of any lake to any member of the public for any period of time is inconsistent with that intent. We cannot agree with this assertion. In many sections of ch. 30 the legislature itself has undertaken to order, limit, and in some cases to foreclose the exercise of certain public rights in navigable waters.[26] The rights of the public

private. Continued pollution of the waters of the state has aroused widespread public concern. . . . The purpose of this act is to grant necessary powers and to organize a comprehensive program under a single state agency for the enhancement of the quality management and protection of all waters of the state, ground and surface, public and private.

[26] *See, e.g.,* sec. 30.90, Stats., which provides:

Neither the county or town may provide, nor shall any subdivider be required or permitted to provide, public access to Lions lake in the town of Alban, Portage county, if such public access will in any way interfere with the use of the lake as a recreational area for the physically handicapped.

Section 30.70, Stats., prohibits skin diving within 150 feet of shore, and within "established traffic lanes." Section 30.68(7)

to use navigable waters are not absolute, but are subject to state and local police power to insure that such rights are exercised in a safe and orderly manner.[27]

This ordinance does not "authorize . . . what the legislature has forbidden; nor does it forbid what the legislature has expressly licensed, authorized, or required." *La Crosse Rendering Works v. La Crosse,* 231 Wis. 438, 457, 285 N.W. 393, 402 (1939) ; *Fox v. Racine,* 225 Wis. 542, 546, 275 N.W. 513, 515 (1937). *See also, City of Janesville v. Garthwaite,* 83 Wis.2d 866, 266 N.W.2d 418 (1978) and *State ex rel. Michalek v. LeGrand,* 77 Wis.2d 520, 253 N.W.2d 505 (1977). In *Janesville, supra,* the court upheld a local noise control ordinance against the assertion that it was not in conformity with the motor vehicle code. The court said:

Though it is true that the enactment of some local traffic regulations in areas not covered by the vehicle code will diminish the uniformity of all traffic regulation in the state, *some amount of disuniformity is expressly provided for* by sec. 349.03 (1) (a) & (b) which permits the enactment of local regulations which are not inconsistent with the code or which are authorized by some other provision of the statutes. 83 Wis.2d at 875, 266 N.W.2d at 423.

Section 30.77 (3), Stats., also expressly contemplates a degree of disuniformity reflecting the "pertinent local conditions" which the DNR is required to consider in rendering an advisory review. Moreover, sec. 30.69, which regulates water skiing on a statewide basis, expressly contemplates local regulation on the subject. Section 30.69 (1) (a) provides that the statutory prohibition

prohibits the operation of boats in marked swimming areas or other restricted use areas.

[27] *Angelo v. Railroad Commission,* 194 Wis. 543, 554, 217 N.W. 570 (1928), *Rossmiller v. State,* 114 Wis. 169, 181, 89 N.W. 839 (1902).

on water skiing between the hours of sunset and sunrise "does not prevent restrictions of the hours of water skiing between sunrise and sunset by local ordinance enacted pursuant to s. 30.77(3)." Section 30.69(1)(b) provides:

Paragraph (a) does not apply to *duly authorized* water ski tournaments, competitions, *exhibitions* or trials therefor, where adequate lighting is provided. (Emphasis supplied.)

We find no inconsistency between this ordinance and the provisions of ch. 30.[28]

Moreover, we think the regulation is "local" within the meaning of the statute. It does not purport to regulate any activity occurring on any navigable waters located outside the jurisdiction of the municipalities. It is designed to protect a historical use of Lake Delton from a purely local threat. Its only statewide impact is, at most, a mild inconvenience to nonlocal residents who might wish to use the restricted area during performance times. This inconvenience, if it can properly be characterized as such, is insignificant when compared to the nonlocal impact of the local boat licensing provisions struck down in *Madison v. Tolzmann,* 7 Wis.2d 570, 97 N.W.2d 513 (1959) or the Sunday ban on motorboating

---

[28] The state also contends that since the ordinance prohibits all uses other than the licensee's, and since such other uses include activities which are not regulated by secs. 30.60–30.71, such as swimming and fishing, the ordinance is in excess of the power delegated to "adopt local regulations . . . *relative to* any activity regulated by ss. 30.60 to 30.71." (Emphasis supplied.) We think the argument is without merit. The ordinance regulates water ski exhibitions by prohibiting them unless licensed and confining them to certain locations and times when they are the exclusive activity. The ordinance is thus relative to an activity regulated by sec. 30.69(1). The fact that it has a temporary effect on other activities not regulated by statute does not change the primary thrust of the ordinance or transform it into a regulation governing, *e.g.*, swimming.

upheld in *Menzer v. Village of Elkhart Lake,* 51 Wis.2d 70, 186 N.W.2d 290 (1971).

For the reasons expressed in the preceding section of this opinion, we also conclude that the ordinance serves the interest of public safety and welfare, within the meaning of sec. 30.77, Stats. We consequently hold that the ordinance meets each of the three tests sets forth in *Menzer, supra.*

The state also contends that the ordinance is invalid because sec. 30.77 does not expressly confer the power to regulate by license, relying on *Brooklyn Center v. Rippen,* 255 Minn. 334, 96 N.W.2d 585 (1959) and *Tolzmann, supra.* Both cases invalidated municipal boat licensing ordinances. In *Brooklyn,* 255 Minn. at 336, 96 N.W.2d at 587, the Minnesota Supreme Court noted that "the power to regulate does not necessarily include the power to license." This language was quoted with approval in *Tolzmann,* 7 Wis.2d at 575–76. *Tolzmann* was decided, however, before the enactment of sec. 30.77 or any of the other statutory boating regulations contained in sections 30.50 through 30.71, Stats. The legislature had not yet spoken on the subject of boating regulations, nor as to what role, if any, it envisioned for municipalities in this area. In this context, it is hardly surprising that the court determined that the city had neither express nor implied power under the general charter power statute to enact a boat licensing ordinance. Its holding received legislative approval in the enactment of sec. 30.77 (1) (a), Stats., which expressly forbids local governments to enact boat license regulations. But the reasons for its holding, as modified by *Jackman,* were not that local governments had no power to license but that the licensing provision was invalid *"because it dealt with a matter of statewide concern." Jackman,* 60 Wis.2d at 711, 211 N.W.2d at 487. (Emphasis supplied.)

Although the legislature did not expressly set forth particular methods of local boating regulation in ch. 30,

we have previously noted that the legislature expressly contemplated regulation by "permit" under these sections, particularly with respect to high speed and use-consumptive activities such as the one here involved. Many local ordinances enacted pursuant to sec. 30.77 (3) employ the "permit" approach to regulate such activities. In a 1970 Research Report to the DNR entitled "Regulations to Reduce Conflicts Between Recreation Water Uses," Dr. Jon A. Kusler noted that approximately one-fourth of the 108 ordinances on file with the department as of July, 1967:

call for an actual permit to be issued before holding a race or regatta. Some such permits require actual written description of the race course, etc. All ordinances requiring a permit, grant the complete right-of-way to all participants so long as the course is properly marked. Additional ordinances require only that permission or authorization be granted by the sheriff, safety patrol, town board, etc. *Wisconsin Department of Natural Resources, Research Report No. 65,* p. 204 (1970).

At least two such ordinances, enacted by the City of Milwaukee[29] and the Village of Pewaukee[30] have re-

[29] The Milwaukee ordinance prohibits water skiing and skin diving within the inner waters of the harbor without a permit. The ordinance provides that permits for motorboat regattas, races, water ski or aqua-plane exhibitions, among other such activities, shall be issued if, in the opinion of the harbor master, such uses can be carried out "in an orderly fashion," safely, and without "undue inconvenience or jeopardy to the public." The permittee must agree to hold the city harmless for any damage, file a certificate of insurance, and pay a permit fee of 50 cents per day per boat. The ordinance provides that boats in any permitted event "shall have the right of way on the permitted area and no other person shall obstruct such area during the event or interfere therewith."

[30] The Village of Pewaukee ordinance prohibits races, regattas and water ski exhibitions "or other water sporting event" without a permit. It provides that the permit "shall specify the course or area of water to be used" and requires the permittee to mark the area with buoys. Permits may be issued "only if in the opinion of

ceived the official sanction of the DNR, as the trial court found. The only logical distinction between the permit approach employed by those ordinances and the license approach here at issue is that the permit systems contemplate an ad hoc or case-by-case permission to use an area of water for a specific purpose, rather than the regular periodic permission here given, and that the permits grant a superior, rather than an exclusive, right of use to the permittee. This is a distinction without a practical difference.

In *Jackman*, 60 Wis.2d at 711, 211 N.W.2d at 487, the supreme court defined "license" as "a right or permission granted by a competent authority to do an act which without such license would be illegal," citing 53 C.J.S. *Licenses* sec. 1 at 445 (1948). The treatise continues at the same page as follows:

It is a formal or official *permit or permission* to carry on some business or do some act which, without the license, would be unlawful, *the words "license" and "permit" often being used synonymously.* (Emphasis supplied.)

In our view, the label affixed to the type of regulation authorized by the statute is immaterial to its validity. This ordinance would have exactly the same effect if all references to a "license" were replaced by the word "permit." Municipalities have traditionally held the power to regulate by licensing under the police power statutes implementing the "home rule amendment" to the Wisconsin Statutes. The power to license is expressly conferred by sec. 61.34 (1).

---

the Chief [of the Water Safety Patrol] the proposed use . . . can be carried out safely and . . . without substantial obstruction of other watercraft or persons using the lake." The permits are valid only during the hours and in the areas specified therein. Permittees have a right-of-way like that provided in the Milwaukee ordinance. Similar provisions govern ice sports.

We therefore hold that secs. 30.77 (3) and 61.34 (1) together confer sufficient authority to enact the regulation here at issue. The state's additional contention that the statute, as we have construed it, provides inadequate guidelines for this type of regulation was answered to the contrary in *Menzer, supra,* which upheld them as "minimally adequate." 51 Wis.2d at 84, 186 N.W.2d at 298.[31]

*By the Court.*—Judgment affirmed.

---

[31] *Cf. State v. Public Service Comm.,* 275 Wis. 112, 116, 81 N.W.2d 71, 73 (1957), where the court upheld an *implied* standard authorizing the PSC to approve a proposed lake fill if it found that the same "will not materially obstruct navigation nor be detrimental to the public interest." *See also Ashwaubenon v. Public Service Comm.,* 22 Wis.2d 38, 125 N.W.2d 647 (1963).